UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

United States of America

v.                                          No. 2:09-cr-00090-1

Stephen Aguiar

## REPORT AND RECOMMENDATION
(Docs. 714, 717, 718, 719, 720, 728, 735, 746, 757)

Stephen Aguiar, proceeding *pro se*, has moved pursuant to 28 U.S.C. § 2255 to

vacate, set aside, or correct his sentence imposed as a consequence of his convictions for

violations of the Controlled Substances Act.  (Doc. 717.)  On April 11, 2011, following

an 11-day jury trial, Aguiar was convicted of one count of conspiring to distribute heroin

and five or more kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1),

841(b)(1)(A), and 846; five counts of distributing cocaine, in violation of 21 U.S.C.

§ 841(a)(1); and one count of possessing with the intent to distribute cocaine, in violation

of 21 U.S.C. § 841(a)(1).  (Doc. 477 at 1–7; Doc. 479 at 1–3.)  Aguiar also was ordered

to forfeit $88,000 to the government.  (Doc. 587.)  On December 12, 2011, United States

District Judge William K. Sessions III sentenced Aguiar to 360 months on each count, to

run concurrently, followed by ten years of supervised release.  (Docs. 586, 590 at 2, 3.)

Aguiar's conviction was affirmed on appeal, *United States v. Aguiar*, 737 F.3d 251 (2d

Cir. 2013), and he currently is serving his sentence.  (Doc. 717 at 2.)

Aguiar now claims that Attorney David J. Williams, who represented Aguiar at

trial and on direct appeal, provided ineffective assistance of counsel in violation of the

Sixth Amendment.  (Doc. 717; *see also* Doc. 723-1 at 13.)  He sets forth ten main ineffective-assistance arguments, which are detailed below.  He includes over 40 exhibits in support of his Motion.  (Docs. 717-2–717-45.)

On December 9, 2015, the government filed its Response in Opposition (Doc. 737), asking the Court to deny Aguiar's Motion without a hearing (*id.* at 32).  The Response includes as an exhibit Attorney Williams's affidavit responding to Aguiar's assertions.  (Doc. 737-1.)  The affidavit details Williams's efforts to represent Aguiar and the various challenges arising from that representation, as well as Williams's review of the evidence and numerous meetings with Aguiar.  (*Id.* at 1–4.)  Williams also describes the several pretrial motions filed on behalf of Aguiar, principally the motions challenging the government's use of wiretap and other electronic evidence.  (*Id.*)  On January 15, 2016, Aguiar filed a Reply to the government's Response (Doc. 745), attaching his own "Declaration" as an exhibit (Doc. 745-1).

Along with his § 2255 Motion, Aguiar has filed other related motions, including a Motion for Order Directing Government or Counsel to Provide Defendant With Discovery Material (Doc. 714); a Motion for Appointment of Counsel (Doc. 718); a Renewed Motion for Appointment of Counsel (Doc. 735); a Motion for Leave to Conduct Discovery (Doc. 719); a Motion to Expand the Record (Doc. 720); a Motion to Supplement the Record (Doc. 728); and a Motion to Strike (Doc. 746).

In May 2016, Aguiar filed a Motion to Supplement (Doc. 756), which the Court construed as a Motion to Amend his pending § 2255 Motion (*see* Doc. 760).  In the Motion to Amend, Aguiar added a new claim under *Brady v. Maryland*, 373 U.S. 83

2

(1963).  (Doc. 756 at 1.)  The Motion to Amend was granted as unopposed, and the

government filed a Response to Aguiar's new arguments in July 2016.  (Doc. 763.)

Aguiar also filed a Motion requesting that the Court "strike Special Agent Richard

Carter's relevant trial testimony and any related GPS evidence."  (Doc. 757 at 1.)  On

August 9, 2016, Aguiar filed a Reply, in which he raised the same arguments asserted in

his supplemental motion.  (Doc. 766.)

For the reasons stated below, I recommend that Aguiar's § 2255 Motion (Doc.

717) be DENIED.  I further recommend that Aguiar's other pending motions (Docs. 714,

718, 719, 720, 728, 735, 746) be DENIED.  If the Court adopts these recommendations, I

recommend that Aguiar's Motion to Strike Agent Carter's testimony and the related GPS

evidence (Doc. 757) be DENIED as moot.

## Background

The facts presented below are derived from filings related to the extensive pretrial

proceedings in this case, the trial and sentencing transcripts, and the U.S. Probation

Office's Presentence Investigation Report (PSR).  This summary is not intended to be

exhaustive, but rather, is intended to include only those facts essential to the pending

motions.

## I.    Investigation and Investigative Techniques

Beginning in 2008, the Drug Enforcement Agency (DEA), in coordination with

the Burlington Police Department, commenced an investigation into the activities of a

large-scale heroin and cocaine distribution ring operating in the Burlington, Vermont

area.  (PSR at 5, ¶ 14; Doc. 613 at 96–97.)  It was later discovered that this distribution

ring was organized, led, and managed by Stephen Aguiar, who used numerous Burlington-area distributors.  Investigators also later discovered that Daniel Reyes served as Aguiar's Massachusetts source of drugs.  (PSR at 5, ¶ 14.)  Trial testimony and documentary evidence revealed that Aguiar traveled approximately weekly to Dorchester, Massachusetts to acquire bulk quantities of drugs for distribution in Vermont.  *(Id.* at ¶¶ 14, 15.)

The investigation utilized a host of investigative techniques, such as physical surveillance, continuous GPS tracking of Aguiar's vehicles, court-approved pen register and trap and trace devices, court-ordered wiretaps, controlled purchases of drug evidence by individuals who were cooperating in the investigation, interviews with cooperating individuals and members of the conspiracy, seizures of drug evidence, and a financial investigation.  (PSR at 5–6, ¶¶ 14–20; *id.* at 7, ¶¶ 21–22; *id.* at 9–15, ¶¶ 25–58; *see also* Doc. 613 at 113.)  The government's presentation at trial consisted of evidence derived from these enforcement efforts as well as testimony from members of the conspiracy who were cooperating with the government as part of cooperation plea agreements.  (*See generally* Docs. 521–23, 613–19, 633 (trial transcripts); Doc. 522 at 90 (Jessica Adcock testimony); Doc. 523 at 80 (Jeremy Mackenzie testimony).)

As noted above, the government's proof included recorded conversations between the conspirators and other electronic evidence.  Thus, the interception of wire communications between members of the conspiracy, pursuant to Title III intercept orders, and the contemporaneous tracking of their location were key components of the

4

government's investigation.[1]  Title III of the Omnibus Crime Control and Safe Streets
Act of 1968 (codified at 18 U.S.C. §§ 2510–22) permits the interception of wire, oral, and
electronic communications in the investigation of certain specified offenses.  Both the
Fourth Amendment and Title III require law enforcement to adhere to certain procedures
in the interception of communications and the applications seeking such authorization.
*See, e.g.*, 18 U.S.C. § 2516; *United States v. Ambrosio*, 898 F. Supp. 177, 181, 184, 186
(S.D.N.Y. 1995) (discussing various Title III and Fourth Amendment requirements).  In
2009, the Court issued multiple orders authorizing law enforcement to intercept
communications involving cell phones linked to Aguiar and his alleged distributors.  (*See
In re Tahair*, No. 2:09-mc-34 (D. Vt. 2009).)  The Court granted Title III wiretap
applications on June 3, June 18, July 2,[2] and July 21, 2009.[3]  (*Id.*, ECF Nos. 8, 14, 18,
20.)  As discussed below, the July 2 application did not include the complete Department
of Justice (DOJ) authorization memorandum required by statute.  (*See id.*, ECF No. 18;
Doc. 624 at 77.)  *See* 18 U.S.C. § 2516(1).  Also in 2009, the Court granted multiple
government applications to install and use pen register and trap and trace (pen/trap)
devices.  (Doc. 371 at 4–5, 28.)  Those orders were issued on the following dates in 2009:

---

[1]  Documents relating to the investigation that led to Aguiar's indictment are docketed in a
miscellaneous case, *In re Tahair*, No. 2:09-mc-34 (D. Vt. 2009).

[2]  This wiretap application was sworn on July 2, but filed on July 6, 2009.  (*See In re Tahair*, No.
2:09-mc-34, ECF Nos. 17, 18.)  The application is referred to herein by the July 2 date, given that the
parties refer to it by that date.  (*See, e.g.*, Doc. 723-1 at 3; Doc. 737 at 8.)

[3]  This order authorized "continued interception."  (*In re Tahair*, No. 2:09-mc-34, ECF No. 20.)

April 3, April 14, May 8, June 5,[4] June 17, and June 23. (*In re Tahair*, No. 2:09-mc-34, ECF Nos. 2, 4, 6, 10, 12, 16.) Notably, the April 3 application contained an incorrect phone number. (Doc. 371 at 26.) The "hybrid" pen/trap orders also authorized the collection of cell-site-location data.[5] (Doc. 371 at 5 n.4, 28; *see, e.g.*, *In re Tahair*, No. 2:09-mc-34, ECF Nos. 1, 2; *see also* Doc. 624 at 13; Doc. 284 at 9; Doc. 625 at 19–20.)

In conjunction with the monitoring of wire communications, law enforcement also used GPS devices to track the movement of Aguiar's vehicles within Vermont and Massachusetts, and between the two states. (*See, e.g.*, Doc. 614 at 108–29, 134–64.) The GPS devices were surreptitiously installed on the vehicles; law enforcement did not obtain search warrants authorizing the installation. (*See, e.g.*, Doc. 371 at 37–38.) Finally, law enforcement subpoenaed records from MySpace.com, an internet social networking website, and accessed Aguiar's MySpace "page." (Doc. 615 at 149.)

## II. Preliminary Proceedings and Indictments

On July 29, 2009, Aguiar was initially charged in a Complaint which alleged that Stephen Aguiar, Brian Tahair, Jessica Adcock, Daniel Reyes, Lisa Foy, Jeremy MacKenzie, Herbert Lawrence, Franklin Grant, William Murray, and Jason Opalenik

---

[4] This order dated June 5, 2009 authorized an extension of a specific installation and a new installation as well. (*In re Tahair*, No. 2:09-mc-34, ECF No. 10.)

[5] According to a court order in this matter, cell-site-location data refers to "location-related data, such as cell tower locations and GPS coordinates." (Doc. 371 at 29.) By way of background, this appears to be different from another component of the case, which was cell "switch" information. At trial, Alexis Eon of Verizon Wireless described "switch" information as the following: "a switch is what transfers calls back and forth from the cell phone. And it is cell tower specific." (Doc. 523 at 211.)

engaged in a conspiracy "among themse[lv]es and others, known and unknown, to knowingly and intentionally distribute cocaine and heroin, Schedule I and II controlled substances."  (Doc. 1 at 1.)  Following the issuance of a warrant (Doc. 4), Aguiar was arrested on July 30, 2009 in South Burlington, Vermont.  (Doc. 47; Doc. 613 at 97, 103).  The next day Aguiar appeared in court for his Initial Appearance without counsel.  (Doc. 46.)  Subsequently, the Court appointed David J. Williams, an experienced member of the Court's Criminal Justice Act panel, to represent him.  (*See* Docket Entry for 07/31/09, CJA 20: Appointment of Attorney David J. Williams for Stephen Aguiar; Doc. 46.)  Aguiar was ordered detained pending trial as it was revealed that he had previously sustained multiple felony convictions, including two prior federal convictions, and was, in fact, serving a term of federal supervised release during the offense conduct alleged in the Complaint.  (Docs. 36, 68; PSR at 22, ¶ 88 n.3.)

On August 13, 2009, the Grand Jury returned an Indictment charging Aguiar and others with multiple violations of the Controlled Substances Act.  (Doc. 86.)  Then, from August 27, 2009 through August 10, 2010, Aguiar was charged in a series of superseding indictments.  (Docs. 97, 175, 265.)  Finally, on March 3, 2011, the Grand Jury returned a Fourth Superseding Indictment that charged Aguiar in nine counts, together with a forfeiture allegation.  (Doc. 409.)  Five days later, Aguiar was arraigned and entered pleas of not guilty to all counts.  (Doc. 416.)  Aguiar and two codefendants, William Murray and Corey Whitcomb, later proceeded to trial on this Fourth Superseding Indictment.  (Doc. 613.)

Two counts of the Fourth Superseding Indictment (Counts 3 and 8) were dismissed by the government during trial.  (Doc. 613 at 42; Doc. 633 at 214.)  As a result, the existing counts set forth in the Fourth Superseding Indictment were re-ordered and trial was held on a Redacted Fourth Superseding Indictment which charged Aguiar and others as follows: Count 1 charged Aguiar and codefendants Murray and Whitcomb with conspiring with Brian Tahair, Franklin Grant, Jeremy Mackenzie, Jessica Adcock, Jason Opalenik, Lisa Foy, and Daniel Reyes to distribute heroin and five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), b(1)(A), and 846 (Doc. 477 at 1); Counts 2 and 3 charged Aguiar and Tahair with distributing cocaine on two different occasions, in violation of 21 U.S.C. § 841(a)(1) (*id.* at 2, 3); Counts 4, 5, and 6 charged Aguiar and Mackenzie with distributing cocaine on three different occasions, in violation of 21 U.S.C. § 841(a)(1) (*id.* at 4, 5, 6); and Count 7 charged Aguiar with possessing cocaine with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (*id.* at 7).  Count 8 provided a forfeiture notice that if convicted, Aguiar would have to forfeit proceeds derived from and property used or intended to be used in the commission of the charged offenses, pursuant to 21 U.S.C. § 853.  (*Id.* at 8.)

## III.    Pretrial Motions

The pretrial proceedings concerning the Title III intercepts and other electronic evidence were complex.  A review of the record reveals that Attorney Williams fought zealously on behalf of Aguiar and appropriately raised numerous issues by means of motions to suppress, in a vigorous effort to challenge and seek suppression of the

electronic evidence garnered by the government in its investigation of the activities of the conspirators.

On March 9, 2010, Williams filed an initial Motion to Suppress seeking suppression of the following: (1) any wire communications that were intercepted pursuant to Title III warrants issued by this Court on June 3, June 18, July 2, and July 21, 2009; (2) evidence discovered pursuant to the April 3, 2009 order that authorized the installation and use of pen/trap devices and required production of "telecommunication records and information"; (3) evidence seized pursuant to a search warrant for Aguiar's Quincy, Massachusetts residence, including cell phones, asserting that the search of the devices was beyond the scope of the warrant; (4) evidence seized without a search warrant from Aguiar's iPhone following his arrest; and (5) evidence seized through the warrantless GPS tracking of Aguiar's vehicles.  (Doc. 171 at 1–2.)  In the Motion, Williams raised statutory and Fourth Amendment constitutional challenges to this evidence.  (*See* Doc. 171.)  He buttressed his challenges to the evidence with 21 exhibits (Docs. 171-1–171-21) in an effort to highlight inconsistencies and alleged improprieties committed by the investigators.

A hearing on the initial Motion to Suppress was held on August 4, 2010.  (Doc. 624.)  Williams outlined the factual and legal bases for suppression of the electronic evidence.  (*See id.*)  In response, the government asserted that Aguiar was attempting to raise legal arguments at the hearing that were either not presented in Aguiar's Motion or not adequately briefed, including the following arguments: the collection of cell-site-location data turned a phone into a tracking device, which requires a search warrant (*id.*

at 12–17); probable cause did not support law enforcement's search of Aguiar's iPhone (*id.* at 33–35); and the delayed sealing of the wire communications collected pursuant to the June 3, 2009 order was unlawful (*id.* at 45–46).  Recognizing that some of Williams's contentions were raised for the first time at the hearing (*id*. at 17–19), the Court indicated that these new issues would be dealt with at a subsequent hearing (*see, e.g.*, *id.* at 35). The Court and the attorneys attempted to sort out which arguments were legal in nature and which required the presentation of testimony.  (*Id.* at 5–26.)  Additionally, Williams advanced cogent and precise arguments in support of his written motions.  (*Id*. at 5–26.)

The evidentiary portion of the hearing focused on the "necessity" requirement of wiretap applications.  (*Id.* at 53, 55–56; 57–70.)  The government presented the testimony of DEA Agent Justin Couture to establish that a Title III intercept was required during the investigation because other investigative procedures had been tried and failed, were unlikely to succeed, or were too dangerous.  (*Id.* at 57–63.)  *See* 18 U.S.C. § 2518(1)(c).[6]

After Agent Couture's testimony, Attorney Williams raised a related argument that the government had failed "to provide the Court with the full [Title III intercept] authorization memo" for the July 2, 2009 wiretap application.  (Doc. 624 at 76–77.)  This argument focused on 18 U.S.C. § 2516(1), which provides that only the Attorney General of the United States, or certain authorized deputies and assistants of the Attorney General, may authorize an application for a wire intercept.  The Court took the

---

[6] To sustain its burden, the government only needed to show some basis to conclude that other investigative techniques were not feasible.  *See id.*; *United States v. House*, 636 F. App'x 50, 52–53 (2d Cir. 2016).

government's alleged failure to disclose the Attorney General's authorization memo under advisement (*id.* at 82), and ordered Williams to file an amended suppression motion, with an opportunity for the government to respond (*id.* at 88).

Subsequently, Attorney Williams filed a Supplemental Motion to Suppress (Doc. 284), in which he further elaborated the claim that law enforcement lacked probable cause to search Aguiar's iPhone, and Williams requested that the Court review the six Orders authorizing the installation of pen registers and trap and trace devices to determine if the applications were supported by probable cause.  (*Id.* at 1.)  Williams later filed Supplemental Authority in Support of Defendant's Supplemental Motion for Request to Review Probable Cause (Doc. 290), to inform the Court of a recent Third Circuit case which Williams argued supported his claim that a showing of probable cause was required before the government could obtain cell-site-location data from cellular service providers.  (*Id.* at 1.)  *See In the Matter of the Application of the U.S. for an Order Directing a Provider of Elec. Commc'n Serv. to Disclose Records to the Gov't*, 620 F.3d 304 (3rd Cir. 2010).

A second suppression hearing was held on October 29, 2010.  (Doc. 625.)  Attorney Williams renewed his challenges to the warrantless search of Aguiar's iPhone in his vehicle, the use of a Trap and Trace authorization under 18 U.S.C. § 2703 to obtain cell-site-location data, and the government's failure to seal the June 3, 2009 intercept on a timely basis as required by 18 U.S.C. § 2518(8)(a).  (*Id.* at 9–17, 17–18, 23.)  Williams filed a second Supplemental Motion to Suppress (Doc. 323), which focused on the three issues he had earlier raised: the delayed sealing of wire communications that were

intercepted pursuant to a June 3, 2009 order (*id.* at 1); the missing page from the DOJ authorization memorandum for the July 2, 2009 Title III intercept application (*id.* at 2); and a purportedly misleading affidavit that supported the April 3, 2009 pen/trap order (*id.* at 3).

On January 2, 2011, the Court issued a comprehensive 47-page Opinion and Order denying Aguiar's Motion to Suppress and Supplemental Motions to Suppress.  (Doc. 371.)  Therein, the Court thoroughly analyzed all the issues raised by Williams except the cell-site-location issue.  (*Id.* at 30, 47.)  The Court explained that the cell-site-location issue was moot in light of the prosecution's statement that the government did not intend to introduce cell-site-location data at trial.  (*Id.* at 30.)  Williams filed a Motion for Reconsideration of the Court's ruling on the cell-site-location-data issue because the government had referred to cell-site-location data in a June 18, 2009 Title III warrant application.  (Doc. 406 at 1–2.)  The Court granted the Motion but found the issue remained moot.  (Doc. 428 at 3, 5.)  Even so, the Court also found the challenged June 18, 2009 Title III warrant was supported by an affidavit that set forth probable cause required for its issuance.  (*Id.* at 3.)  In arriving at this conclusion, the Court reviewed the application and supporting affidavit in detail, concluding that if the challenged cell-site data was excised from the affidavit, probable cause continued to exist.  (*Id.* at 3–5.)

The jury was selected on March 8, 2011, with trial to commence on March 28, 2011.  (Docs. 417, 452.)  Approximately a week before the start of trial, the prosecution reversed course and filed a Motion in Limine indicating that it would offer into evidence cell-site-location data.  (Doc. 444 at 1).  Given this changed posture, the Court issued an

Order to "address the merits of Mr. Aguiar's [supplemental] motion to suppress [regarding the cell-site-location-data issue] and request for review of probable cause." (Doc. 449 at 1–2.)  Electing not to reach unresolved issues of constitutional law, the Court granted Aguiar's motion for a probable-cause review of various hybrid cell-site-data applications—applications which requested "pen register and trap and trace information" and cell-site-location data (*id.* at 2)—and "assume[d], without deciding, that the Fourth Amendment requires that the Government meet the probable cause standard in order to collect [cell-site-location information]" (*id.* at 4).  After "re-review[ing]" the hybrid applications (*id.* at 5), the Court found that probable cause supported each pen/trap order.  (*Id.* at 8.)  Thus, the Court denied Aguiar's Supplemental Motion to Suppress the cell-site-location data, and granted the government's Motion in Limine, permitting the introduction of that evidence at trial.[7]  (*Id.*)

---

[7]  Attorney Williams filed a number of other pretrial motions, some of them relevant to Aguiar's claim that Williams's representation of him was ineffective.  First, Williams filed a motion requesting that the Court "order the United States Marshal's Service to replace Defendant's legal file which was disposed of by its agents at the Essex County, New York jail in September 2010."  (Doc. 339 at 1.)  The Court denied the Motion.  (Doc. 377.)  Williams also filed a sealed ex parte motion seeking reimbursement for an iPod that he gave to his client to listen to while imprisoned.  (Doc. 384 at 1.)  The iPod was loaded with "recordings of conversations intercepted pursuant to this Court's Title III orders."  (*Id.*)  The Court granted the Motion.  (Doc. 429.)  Williams also filed a Sealed Ex Parte Motion for Approval of Expert Witness Fees, seeking to hire psychology professor Dr. Paul R. Solomon to evaluate Aguiar's potential diminished capacity due to a traumatic brain injury sustained in childhood.  (Doc. 156 at 1; *see* PSR at 37–38, ¶ 129.)  The Motion was granted.  (Doc. 157.)

Also, on February 11, 2011, a few weeks before the start of trial, the government submitted an Information Pursuant to 21 U.S.C. § 851, alleging that Aguiar had sustained a drug felony conviction in 2001.  (Doc. 396.)  According to the Information, that conviction was for "possession with the intent to distribute heroin in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B), a felony drug offense."  (*Id.* at 1.)  This prior conviction would increase Aguiar's potential mandatory minimum sentence if he was convicted at the trial of the conspiracy count (Count 1), as that count alleged that the conspiracy involved the distribution of five kilograms or more of cocaine.  Section 841(b)(1)(A) provides, in part, "such person shall be sentenced to a term of imprisonment which may not be less than 20 years and not more than life imprisonment."

## IV.    Trial

On March 28, 2011, trial commenced against Aguiar and his two codefendants, William Murray and Corey Whitcomb.  Other codefendants in the case pled guilty, many agreeing to cooperate with the government.  (PSR at 4, ¶ 12; *see also* Docs. 232 (Change of Plea, Jason Opalenik); 250 (Lisa Foy); 253 (Franklin Grant); 273 (Brian Tahair); 280 (Daniel Reyes); 287 (Jeremy Mackenzie); 302 (Jessica Adcock); 317 (Herbert Lawrence).)  The trial lasted 11 days, ending with the jury's verdict on April 11, 2011. (Docs. 452, 456, 462, 464, 465, 470, 472, 474, 475, 476, 478.)  During the trial, the government called 25 witnesses and introduced roughly 200 exhibits.  (*See id.*; *see also* Docs. 484, 486.)  The most relevant evidence is summarized below.

### A.    Witnesses

The government called multiple DEA agents who were involved in the investigation.  DEA Task Force Agent Couture, one of the lead investigators, outlined the initiation of the investigation into the conspiracy and investigative techniques used by the agents.  (Doc. 613 at 111, 113.)  In addition to his description of the overall investigation, Couture also described the July 30, 2009 arrest of Aguiar.  (*Id.* at 112–15.)  Aguiar was arrested that day outside his father's South Burlington, Vermont apartment.  (*Id.* at 112–13.)  When officers approached Aguiar, he fled and was apprehended after a short chase. (*Id.* at 101 (Detective Petralia testimony).)  Couture testified that following his arrest, Aguiar spontaneously stated to Couture, "If you are going to play, you gotta pay."  (*Id.* at 115.)  Couture stated that, as Aguiar fled, he dropped a bag containing "[a] digital scale and two syringes."  (*Id.* at 138.)  Couture described post-arrest searches of Aguiar's

vehicle, cell phones, and iPhone (*id.* at 141–44, 147–49), and the discovery of a package containing 140 grams of cocaine (PSR at 7, ¶ 20).  The package was found in the immediate wooded area where Aguiar was apprehended after his short flight.  (Doc. 613 at 158, 162–64.)

DEA Task Force Agent Jared Hatch was the co-case agent with Couture, and he and Couture also testified about controlled purchases of drug evidence accomplished from members of the conspiracy.  These included purchases from coconspirators Jeremy Mackenzie, Herbert Lawrence, Brian Tahair, and Franklin Grant.  (*See, e.g.*, *id.* at 215–34, 244–52; *see also* PSR at 6–7, ¶ 20.)  Later in the trial, Couture and Hatch testified about their roles in the surveillance of members of the conspiracy.  (Doc. 614 at 15–27 (Couture), 30–36 (Hatch).)  Couture also described the following: the data that was collected through the pen/trap devices and wiretaps, such as calls between various codefendants (Doc. 521 at 49–88), telephone "switch" information (Doc. 614 at 173–218), Aguiar's MySpace page (Doc. 615 at 149–54), and Aguiar's credit card statements (Doc. 617 at 23–26).

Other DEA agents testified about their roles in the investigation and surveillance of members of the conspiracy.  DEA agents John O'Connor, Thomas L. Doud, Adam Chetwynd, and Richard Carter described the physical surveillance that they conducted of Aguiar and his associates.  (Doc. 614 at 93–97 (O'Connor), 39–63 (Doud), 97–103 (Chetwynd), 104–08 (Carter).)  Agent Carter also testified about the GPS tracking of Aguiar's vehicles.  (Doc. 614 at 104–19, 134–64.)  Specifically, he described the GPS surveillance process, including how he assisted with installing and replacing GPS devices

on Aguiar's vehicles.  (*Id.* at 108–19, 145–50.)  Using the GPS data, Agent Carter also described Aguiar's travel pattern between Vermont and Massachusetts.  (*Id.* at 134–64.) Later, DEA Special Agent John McDonnell testified about physical surveillance of Aguiar conducted in Massachusetts (Doc. 616 at 205–22), and two other agents—Jerry Valenti and Jared Hatch—described the execution of search warrants at Aguiar's Vermont (Doc. 617 at 111–16) and Massachusetts (*id.* at 120–30) residences.  Hatch described the seizure of $45,000 in currency from a secret compartment in a closet at Aguiar's Quincy, Massachusetts residence.  (Doc. 617 at 126.)

Several records custodians and other witnesses testified about the following: Aguiar's vehicle purchases (Doc. 616 at 188–204), Aguiar's substantial cash deposits into his bank accounts (Doc. 617 at 54–71; 73–98), Verizon wireless cell phone data and court orders Verizon received in this case (Doc. 523 at 208–47), technology purchased by law enforcement and used to capture the audio from phone calls between Aguiar and his associates (Doc. 521 at 5–44; 49–69), analyses of phone calls between the coconspirators (Doc. 616 at 4–47), laboratory analyses of samples in this case that tested positive for cocaine and heroin (*id.* at 48–68), and an arrest of Aguiar in New Hampshire for reckless driving, during which a New Hampshire State Trooper seized $8,600 in currency from Aguiar (Doc. 617 at 98–109).

The trial also included presentation of the recordings of the Title III intercepts. (*See, e.g.*, Doc. 521 at 158–72.)  Significant aspects of these recordings were summarized in the PSR.  (*See* PSR at 8, ¶ 24.)

16

As noted above, the government called multiple codefendants to testify about their involvement with Aguiar and their participation in the Burlington-area drug distribution. Those individuals included Jeremy Mackenzie (Doc. 523 at 16–207); Jason Opalenik (Doc. 521 at 92–222); Jessica Adcock (*id.* at 235–248; Doc. 522 at 4–159); Brian Tahair (Doc. 633 at 124–208; Doc. 615 at 4–101); and Lisa Foy (Doc. 616 at 76–188). These individuals described their respective roles in the lengthy drug conspiracy, their dealings with Stephen Aguiar, and Aguiar's supervisory role. They also described in detail how, when, and where they acquired cocaine and heroin from Aguiar. Jason Opalenik's testimony was particularly devastating to Aguiar as he described their numerous drug transactions, where Aguiar supplied Opalenik with multiple-ounce quantities of cocaine and multiple grams of heroin on a weekly or biweekly basis. (Doc. 521 at 100–15.) Similarly, Jessica Adcock described how she accompanied Aguiar to Massachusetts where he acquired cocaine and heroin on a regular basis. (Doc. 522 at 13–15.) Adcock also described watching Aguiar, at his father's South Burlington residence, dilute the drugs with other substances and then repackage them for resale in Vermont. (*Id.* at 18–20.) Jeremy Mackenzie described receiving multiple-gram quantities of heroin from Opalenik, and stated that he was aware Opalenik's source of supply was Aguiar. (Doc. 523 at 83.) Finally, Brain Tahair explained intercepted recordings of negotiations for drug prices and other distribution arrangements between him and Aguiar. (Doc. 615 at 14–22.)

### B.    Other Evidence

Over 200 documents and tangible objects were admitted at trial.  (Docs. 482, 484.)

These included quantities of cocaine purchased or otherwise seized in the investigation;

recordings of the controlled purchases; photographs of key locations in the investigation;

photographs taken from Aguiar's MySpace page and iPhone; various cell phones,

including tracfones and an iPhone; contact lists from cell phones; call details[8]; the duffle

bag found during Aguiar's arrest, along with syringes and a scale found in the hidden

compartment of the bag; letters from Aguiar to his codefendants; court orders; and more.

When the government rested its case, Williams moved for a Judgment of

Acquittal, which was denied.  (Doc. 617 at 135, 138.)  Williams then rested his case

without calling any witnesses, while codefendant Murray's lawyer called two witnesses.

(*Id.* at 171–89.)

### C.    Forfeiture Count and Charge to Jury

On April 8, 2011, Aguiar waived his right to a jury trial on the Indictment's

forfeiture count.  (Doc. 476.)  Counsel gave closing arguments; the Court charged the

jury; and the jury retired to begin deliberations.  (*Id.*)

### D.    Verdict

On April 11, 2011, the jury returned the verdict, finding Aguiar guilty of Counts

One through Seven of the Redacted Fourth Superseding Indictment.  (Doc. 478.)

Specifically, the jury found Aguiar guilty of a conspiracy that involved five kilograms or

---

[8]  "Call detail records would show incoming and outgoing calls, switches, the date of the call, the time of the call, the duration of the call."  (Doc. 523 at 214 (testimony of Alexis Eon).)

more of cocaine (Doc. 479 at 1), a drug quantity which increased the mandatory

minimum sentence under 21 U.S.C. § 841(b)(1)(A).[9]

## V.      Presentence Investigation Report and Sentencing

In advance of sentencing, the U.S. Probation Office submitted the PSR to the

Court.  The document concluded that Aguiar's adjusted offense level under the United

States Sentencing Guidelines (USSG) was 37 and criminal history category was VI, and

thus the guideline imprisonment range was 360 months to life (PSR at 41, ¶ 147), with

supervised release of not less than ten years (*id.* at 42, ¶ 150).  The government and

defense both submitted objections to the report for the Probation Office's consideration.

(*See id.* at 44, Addendum to the Presentence Report.)  The government objected to the

inclusion of a report by Dr. Paul Solomon, who had been retained by Williams to conduct

a neuropsychological evaluation of Aguiar.  (*Id.*)  Attorney Williams submitted factual

objections relating to the GPS surveillance and an inmate's statement that he observed

Aguiar offer $10,000 to another inmate to obstruct justice.  (*Id.* at 45.)  Williams also

objected to application of the aggravating-role adjustment found at USSG § 3B1.1(c), and

to certain information regarding Aguiar's criminal history.  (*Id.*; *see also id.* at 22

(calculating Aguiar's § 3B1.1(c) adjustment for being "organizer, leader, manager, or

supervisor").)

Also before sentencing, both parties filed sentencing memoranda.  Attorney

Williams argued in favor of a non-guideline sentence, or in the alternative, a variance

---

[9]  A conviction under § 841(b)(1)(A) carries a mandatory minimum sentence of "not . . . less than 10 years or more than life."  *Id.*  However, as noted earlier, Aguiar's prior 2001 conviction increased the mandatory minimum to "not be less than 20 years and not more than life imprisonment."  *Id.*

from the guideline sentence.  (Doc. 573 at 1.)  First, Williams asserted that Aguiar was a nonviolent individual.  (*Id.* at 2–3.)  Second, Williams compared Aguiar's potential sentence to his codefendants' sentences and other sentences in this district for drug-related convictions, arguing that the guideline sentence recommended for Aguiar exceeded the exposure of other members of the conspiracy.  (*Id.* at 2–7, 10; PSR at 4, ¶ 12; Docs. 583, 584.)  Third, Williams presented information regarding Aguiar's head injuries as part of an overall effort to establish that Aguiar suffered from a traumatic brain injury resulting in a diminished capacity.  (Doc. 573 at 7–9.)  Lastly, Williams asserted that a 20-year sentence was sufficient to address the overall goals of sentencing.  (*Id.* at 9–10.)  In opposition, the government argued for a sentence consistent with the Sentencing Guideline calculation set forth in the PSR.  (Doc. 578 at 2, 4–7.)

Aguiar appeared before Judge Sessions for sentencing on December 12, 2011. (Docs. 586, 629.)  The Judge asked Williams whether he had received a copy of the PSR and whether he had reviewed it with Aguiar.  (Doc. 629 at 6.)  Williams said that he had. (*Id.*)  When asked whether he found any errors in the report, Williams objected to the PSR's reference to a "court-ordered GPS."  (*Id.*)

The Court heard argument from Attorney Williams with respect to Aguiar's request for a non-guideline sentence.  (*Id.* at 7–14.)  Williams asserted that Aguiar possessed a nonviolent nature.  (*Id.* at 10, 11.)  After his conviction, however, Aguiar had sent a photograph of decapitated individuals to a witness in the case.  (*Id.* at 9; PSR at 18, ¶ 67(e).)  Williams attempted to explain this threatening behavior by suggesting that Aguiar's prior head injuries affected his ability to control his behavior.  (Doc. 629 at

20

9–10.)  Williams also attempted to distinguish Aguiar from "extremely violent people" who had been sentenced by the Court.  (*Id.* at 8–13.)  Williams asked for the 20-year mandatory minimum sentence.  (*Id.* at 12–13.)  Aguiar declined to address the Court "because of the possibility of a reversal on appeal due to the GPS issue," according to Williams.  (*Id.* at 13.)

The government then presented its argument, first requesting that the Court not consider Dr. Solomon's report about the head injuries in its sentencing decision.  (*Id.* at 14.)  Judge Sessions indicated the report likely would not impact the sentence.  (*Id.*)  The government proceeded to highlight the well-organized nature of the conspiracy in this case (*id.* at 15), the damage Aguiar caused to victims including children (*id.* at 18), Aguiar's manipulation of women (*id.* at 18–19), and Aguiar's attempts to obstruct justice during the pretrial, trial, and post-trial phases of the litigation (*id.* at 19).

After hearing the parties' arguments, Judge Sessions engaged in a thorough discussion of the sentencing factors under 18 U.S.C. § 3553(a).  (*Id.* at 20–22.)  Judge Sessions thereupon calculated the Guideline sentence.  (*Id.* at 23.)  Counts 1 through 7 of the Redacted Fourth Superseding Indictment were subject to grouping under the Sentencing Guidelines.  (*Id.*)  The Court found that there was a preponderance of the evidence that the offense involved five or more kilograms of cocaine, and found that Aguiar was subject to enhancements for being a leader or organizer and had obstructed justice.  (*Id.*)  Moreover, Judge Sessions concluded that Aguiar was subject "to the enhanced penalties pursuant to the career offender provisions" because he had "at least two prior felony convictions of either a crime of violence or controlled substance."  (*Id.*)

21

Consequently, Judge Sessions concluded that under the Sentencing Guidelines, the range was "360 months to life" with ten years of supervised release, a determination that was consistent with the PSR.  (*Id.* at 23–24; PSR at 41, ¶¶ 147, 149.)  The Court declined to vary or otherwise depart from the advisory Sentencing Guideline range and proceeded to impose a sentence of 360 months, to be followed by a 10-year term of supervised release. (*Id.* at 24.)  Aguiar was then advised of his right to pursue a direct appeal.  (*Id.* at 26.)

## VI.   Direct Appeal

Aguiar filed a Notice of Appeal on December 16, 2011.  (Doc. 594.)  Attorney Williams continued to represent Aguiar on appeal to the Second Circuit, raising the following arguments: (1) that the warrantless GPS tracking of Aguiar's automobile violated Aguiar's Fourth Amendment right to be free from an unreasonable search and seizure (Appellant's Corrected Brief at 29–38, *Aguiar*, 737 F.3d 251, ECF No. 161 (Case No. 11-5262)); (2) that the District Court erred in denying Aguiar a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), on the discrepancy in an affidavit supporting the April 3, 2009 pen register application (*id.* at 38–44); (3) that the District Court erred when it refused to suppress evidence found pursuant to a warrantless search of Aguiar's iPhone (*id.* at 44–47); and (4) that the District Court erred by failing to hold an evidentiary hearing based on the missing page from the DOJ Title III intercept authorization memorandum for the July 2 application (*id.* at 47–50).  (*See* Notice of Appearance, *United States v. Aguiar*, 737 F.3d 251 (2d. Cir. 2013), ECF No. 39 (Case No. 11-5262).)

The Second Circuit affirmed Aguiar's conviction—and the convictions of his two codefendants, Murray and Whitcomb—in an opinion issued on December 13, 2013. *United States v. Aguiar*, 737 F.3d 251 (2d Cir. 2013). First, the Court of Appeals examined the GPS-tracking issue, discussing the evolution of the law surrounding "tracking technology." *Id.* at 256. The Court of Appeals then described the U.S. Supreme Court's decision in *United States v. Jones*, 132 S. Ct. 945 (2012), which was decided just a few weeks after Aguiar filed his Notice of Appeal in the Second Circuit, and which altered Fourth Amendment jurisprudence regarding GPS tracking. *Aguiar*, 737 F.3d at 258–60. In *Jones*, "[t]he Court held that 'the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a "search"' within the meaning of the Fourth Amendment." *Id.* at 258 (quoting *Jones*, 132 S. Ct. at 949). Still, the Second Circuit noted that the Supreme Court had not resolved the question of "whether the warrantless use of GPS devices would be 'reasonable—and thus lawful—under the Fourth Amendment [where] officers ha[ve] reasonable suspicion, and indeed probable cause' to execute such a search." *Id.* at 259 (alterations in original) (quoting *Jones*, 132 S. Ct. at 954). Consequently, the Second Circuit applied the "good faith exception" to a warrant requirement regarding the GPS tracking in Aguiar's case, concluding that law enforcement relied on then-binding precedent to install and monitor the GPS devices. *Id.* at 262. Based on that precedent, the Second Circuit found that "law enforcement could reasonably conclude that placing a GPS device on the exterior of Aguiar's vehicles did not violate the Fourth Amendment." *Id.* at 261.

23

Turning to Aguiar's next argument, the Second Circuit upheld the District Court's ruling that had (1) denied the suppression of evidence that was found pursuant to the April 3, 2009 pen register and trap and trace order, an application which had been supported by an affidavit containing an incorrect phone number, and (2) denied Aguiar's request for a *Franks* hearing.  *Id.* at 262.  The Court of Appeals agreed with Judge Sessions's analysis, finding:

> [E]ven if the false statement were stricken from the affidavits, the affidavits are replete with information regarding controlled purchases of cocaine, in-person surveillance of Aguiar's travels and the use of multiple "burn" cell phones to conduct business among the target subjects—all of which would satisfy the necessary grounds to issue a hybrid order.

*Id.* at 263.  The Second Circuit also upheld the District Court's ruling with regard to the search of Aguiar's iPhone, holding that "any error resulting from the introduction of evidence collected from Aguiar's phone was harmless."  *Id.*  Lastly, the Second Circuit agreed with the District Court's denial of a hearing on the issue of the missing page from the DOJ authorization memorandum.  *Id.* at 263–64.  The Court of Appeals stated:

> The affidavit submitted to the district court attached a complete copy of the filing that the government received from the clerk's office, and it is unclear what else the government could do to prove its contention that it submitted a complete application to the court.  We find no error in the district court's refusal to conduct a hearing.

*Id.* at 264.

Aguiar, through counsel, filed a petition for a rehearing en banc, which was denied.  (*Aguiar*, 737 F.3d 251, ECF Nos. 305, 310 (Case No. 11-5262)).  On May 12, 2014, Aguiar filed a petition for writ of certiorari in the U.S. Supreme Court, and the petition was denied.  (*Aguiar*, 737 F.3d 251, ECF Nos. 308, 315 (Case No. 11-5262)).

24

## VII.    Section 2255 Motion

On September 10, 2015, Aguiar filed the instant § 2255 Motion, arguing that

Attorney Williams was ineffective in proceedings before the District Court and on direct

appeal.[10]  Specifically, Aguiar claims that Williams's performance was deficient for the

following reasons: (1) Williams failed to move to suppress evidence derived from

MySpace (Doc. 723-1 at 24–29); (2) Williams failed to assert that the District Court did

not have jurisdiction to authorize use of the pen/trap devices or collection of cell-site-

location data (*id.* at 29–40); (3) Williams failed to argue that wiretap evidence should be

suppressed on the bases that Aguiar's cell phones and calls were outside of the District of

Vermont at the time warrants were issued, and the government misled the Court in

making its applications (*id.* at 40–45); (4) Williams failed to move to suppress the June 3,

June 18, and July 2, 2009 wiretap warrants under *Franks*, and failed to argue that the

government did not meet the "necessity" requirement for the warrants (*id.* at 46–68);

(5) Williams failed to present "exculpatory record evidence" regarding the April 3, 2009

pen/trap application (*id.* at 68–75); (6) Williams did not contest the government's failure

to give him complete copies of the June 3 and July 2, 2009 applications and supporting

documents before Aguiar's detention hearing (*id.* at 75–80); (7) Williams did not

immediately challenge, investigate, or argue government misconduct when the

government failed to include the complete DOJ authorization for the July 2, 2009 wiretap

warrant (*id.* at 80–84); (8) Williams failed to move for the District Court Judge's recusal

---

[10]  The Court addresses the arguments in Aguiar's supplemental motion (Doc. 756) below.  *See infra* p. 71.

from the suppression hearing regarding the July 2, 2009 wiretap warrant (*id.* at 84–88); (9) Williams denied Aguiar access to his legal documents and ignored his requests to review discovery related to his case, including *Jencks* and *Giglio* materials (*id.* at 88–92); and (10) Williams failed to raise the issue of prosecutorial misconduct on appeal (*id.* at 92–100).

Aguiar seeks to have his convictions and sentence vacated.  (Doc. 717 at 13.)  He also asks that he be resentenced in the event that his prior convictions from 1995 or 2001 are vacated, pursuant to a "Petition for Writ of Error Coram Nobis," which he claims is pending in a criminal case before this Court.  (Doc. 723-1 at 100.)[11]

## Analysis

### I.      Legal Standards

#### A.      28 U.S.C. § 2255

A prisoner in federal custody may file a motion under 28 U.S.C. § 2255 on the grounds that his "sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  28 U.S.C. § 2255(a).  Generally, under § 2255, relief is available "only

---

[11]  On September 15, 2015, Aguiar filed a "Notice of Filing of a Corrected Memorandum of Law in Support of Motion to Vacate, Set Aside, or Correct a Federal Sentence," along with an accompanying "Corrected Memorandum" intended to "replace" Aguiar's original Memorandum.  (Doc. 723 at 1.) Therein, Aguiar claims that the "Corrected Memorandum" amends only "nonsubstantive typographical errors" made in his original Memorandum.  (*Id.*)  The Court has accepted the "Corrected Memorandum" and references it herein.  Similarly, on February 8, 2016, Aguiar filed a "Corrected Reply to Government's Opposition to Motion under 28 U.S.C. § 2255" (Doc. 751), which the Court has also accepted and references herein.

for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *Cuoco v. United States*, 208 F.3d 27, 30 (2d Cir. 2000) (internal quotation marks omitted).  The burden of proof on a § 2255 motion falls on the claimant by "a preponderance of the evidence." *Triana v. United States*, 205 F.3d 36, 40 (2d Cir. 2000); *see Napoli v. United States*, 45 F.3d 680, 683 (2d Cir. 1995) (noting "usual burden" on petitioners).  Thus, Aguiar bears the burden of establishing his § 2255 claims by a preponderance of the evidence.

Typically, two hurdles may bar a petitioner's claims: waiver by a guilty plea, *United States v. Hsu*, 669 F. 3d 112, 117–18 (2d Cir. 2012), or procedural default by failing to raise an issue on direct appeal, *Marone v. United States*, 10 F.3d 65, 67 (2d Cir. 1993) (per curiam).  These hurdles do not apply here because Aguiar did not plead guilty and claims of ineffective assistance of counsel may be brought in a § 2255 motion even if they were not raised on direct appeal.  *Massaro v. United States*, 538 U.S. 500, 504 (2003); *Amiel v. United States*, 209 F.3d 195, 198 (2d Cir. 2000).  "Because the Sixth Amendment provides criminal defendants with the right to effective assistance of counsel, inadequate representation is a basis for relief under section 2255." *Morales v. United States*, 635 F.3d 39, 43 (2d Cir. 2011) (internal citation omitted).

### B.    Ineffective Assistance of Counsel

The Sixth Amendment protects the right to effective assistance of counsel at all critical stages of the proceedings, *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013), including various pretrial proceedings, *see, e.g.*, *Kimmelman v. Morrison*, 477

U.S. 365, 384–85 (1986) (pretrial suppression motion), and representation on appeal,

*Smith v. Murray*, 477 U.S. 527, 535–36 (1986).  "The constitutional guarantee applies to

pretrial critical stages that are part of the whole course of a criminal proceeding, a

proceeding in which defendants cannot be presumed to make critical decisions without

counsel's advice."  *Lafler v. Cooper*, 132 S. Ct. 1376, 1385 (2012).

In order to prevail on an ineffective-assistance-of-counsel claim, a claimant must

satisfy the two-pronged *Strickland* test:

> (1) he "must show that counsel's performance was deficient," so deficient
> that, "in light of all the circumstances, the identified acts or omissions were
> outside the wide range of professionally competent assistance," and (2) he
> must show "that the deficient performance prejudiced the defense," in the
> sense that "there is a reasonable probability that, but for counsel's
> unprofessional errors, the result of the proceeding would have been
> different."

*Bennett v. United States*, 663 F.3d 71, 84 (2d Cir. 2011) (internal citations omitted)

(quoting *Strickland v. Washington*, 466 U.S. 668, 687, 690, 694 (1984)).  "The

[ineffective-assistance-of-counsel] claim must be rejected if the defendant fails to meet

either the performance prong or the prejudice prong."  *Bennett*, 663 F.3d at 85.  Because

"[a]n ineffective-assistance claim can function as a way to escape rules of waiver and

forfeiture," *Premo v. Moore*, 562 U.S. 115, 122 (2011), a court must use "scrupulous

care" in applying *Strickland*.  *Id.* (citing *Strickland*, 466 U.S. at 689–90).

Under *Strickland*'s performance prong, an attorney's performance is deficient

"when it falls 'below an objective standard of reasonableness,' as determined by

reference to 'prevailing professional norms.'"  *Morales*, 635 F.3d at 43 (quoting

*Strickland*, 466 U.S. at 688).  More specifically, "[t]he question is whether an attorney's

representation amounted to *incompetence* under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Premo*, 562 U.S. at 122 (emphasis added) (quoting *Strickland*, 466 U.S. at 690). Courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Hemstreet v. Greiner*, 491 F.3d 84, 90 (2d Cir. 2007) (quoting *United States v. Kurti*, 427 F.3d 159, 163 (2d Cir. 2005)). Notably, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *DeLuca v. Lord*, 77 F.3d 578, 588 (2d Cir. 1996) (quoting *Strickland*, 466 U.S. at 690).

The *Strickland* test requires that "scrutiny of counsel's performance be highly deferential." *Morales*, 635 F.3d at 44 (quoting *Strickland*, 466 U.S. at 689). Additionally, a *Strickland* analysis must counteract "'the distorting effects of hindsight.'" *Id.* (quoting *Strickland*, 466 U.S. at 689). The test therefore requires courts "to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* (quoting *Strickland*, 466 U.S. at 689).

With regard to *Strickland*'s prejudice prong, the claimant must prove "'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Hill, v. Lockhart*, 474 U.S. 52, 57 (1985) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 694).

Attorney representation at the trial and appellate stages of litigation is assessed under the same *Strickland* standards.  *Murray*, 477 U.S. at 535–36; *Aparicio v. Artuz*, 269 F.3d 78, 95 (2d Cir. 2001) ("Although it was born in the context of ineffective assistance of trial counsel, *Strickland*['s] two-prong test applies equally to claims of ineffective assistance of appellate counsel on a defendant's first appeal as of right." (citing *Evitts v. Lucey*, 469 U.S. 387, 396–97, (1985))).

## II.     Ineffective-Assistance-of-Counsel Claims

### A.     Attorney Williams's Failure to Seek Suppression of MySpace Evidence

Aguiar claims that Attorney Williams's representation was ineffective in the District Court and on direct appeal because Williams failed to move to suppress evidence from Aguiar's MySpace page and subsequently failed to raise the issue on appeal before the Second Circuit.  (Doc. 723-1 at 24–29.)

The record shows that Williams did not file a pretrial motion to suppress evidence from Aguiar's MySpace account, and such evidence was admitted at trial.  During his testimony, Agent Couture authenticated certain MySpace photographs of Aguiar's vehicles, and specifically described a photograph of Aguiar and Adcock standing in front of a Subaru.  (Doc. 613 at 140, 141.)  He later testified about subpoenaed MySpace records, which included messages sent from Aguiar's MySpace user number.  (Doc. 615 at 149–51, 153.)  Couture connected the content of one of Aguiar's MySpace messages to a correlating change in the "call patterns" of a monitored phone.  (*Id.* at 151–55.)

Aguiar argues that Williams's performance with respect to the MySpace evidence was deficient because "photographs and other communications in electronic storage for

180 days or less were obtained by [the] DEA without a valid search warrant in violation

of 18 U.S.C. § 2703(a) and Fed. R. Crim. P. 41, the Fourth Amendment, and [Aguiar's]

reasonable expectation of . . . privacy."  (Doc. 723-1 at 24.)[12]  Aguiar further argues that

the "MySpace.com evidence was significant in advancing DEA's investigation" (*id.* at

27), and "tainted evidence motivated both investigative and trial decisions" (*id.* at 28).[13]

He asserts: "Had counsel moved to suppress MySpace evidence, its direct and derivative

evidence would have been excluded . . . ."  (*Id.* at 28–29.)  Thus, according to Aguiar,

there was "substantial prejudice" to his case, and "but for counsel's unprofessional errors,

there is a reasonable probability that the outcome of the proceedings would have been

different."  (*Id.* at 29 (citing *Strickland*, U.S. at 694).)

---

[12]  Aguiar adds that the DEA's "demand for Movant's records was executed outside of Vermont's territorial jurisdiction."  (*Id.*)  It is unclear whether this assertion is a legal argument.  Regardless, Aguiar presents no analysis or controlling authority for this point beyond passing references to the following: MySpace's location in Berkeley, CA and the required production of MySpace records "at 60 Main Street in Burlington, Vermont."  (Doc. 723-1 at 26.)  Aguiar does cite a Florida case, *In Re Search Warrant*, 362 F. Supp. 2d 1298, 1299 (M.D. Fla. 2003), in which the court discusses 18 U.S.C. § 2703 (and Federal Rule of Civil Procedure 41), but Aguiar's reliance on that case is misplaced.  The case concerned an out-of-district warrant under § 2703, not a subpoena, and the Magistrate Judge's decision was later reversed by a Florida district court.  *See In Re Search Warrant*, 362 F. Supp. 2d 1298, 1299 (M.D. Fla. 2003), *rev'd*, No. 6:05-MC-168-Orl-31JGG, 2005 WL 3844032, at *6 (M.D. Fla. Feb. 13, 2006); *see also United States v. Scully*, 108 F. Supp. 3d 59, 80 (E.D.N.Y. 2015) (noting that same Magistrate Judge ruling in Florida "was later reversed on appeal to a District Judge" (citing *In re Search Warrant*, 2005 WL 3844032, at *6)).  Therefore, Aguiar's unsubstantiated assertion regarding "territorial jurisdiction" for the MySpace.com subpoena fails.

[13]  Aguiar also claims that counsel should have requested "a taint hearing to determine to what extent MySpace evidence played in shaping DEA's investigation."  (Doc. 723-1 at 27.)  "[I]t is clear that, once the defendant establishes that an illegal search has occurred, the Court 'must' give some sort of 'opportunity' for the defendant to satisfy his initial burden of showing taint in a 'substantial portion' of the Government's case."  *United States v. Vilar*, 530 F. Supp. 2d 616, 641 (S.D.N.Y. 2008) (quoting *United States v. Magaddino*, 496 F.2d 455, 460 (2d Cir. 1974)).  Given that Aguiar has not demonstrated there was an illegal search, his assertion regarding a "taint hearing" fails.

In an affidavit (Doc. 737-1), Attorney Williams provides a brief explanation of his strategy.  He states that he considered a suppression argument, but his "review of the My[Spa]ce evidence revealed that the incriminating evidence had been obtained from Mr. Aguiar's public My[S]pace page."  (Doc. 737-1 at 1.)[14]  Consequently, he elected not to seek suppression of the evidence.  (*Id.*)

The government maintains that Williams provided effective representation, asserting that "[t]here were no grounds to move to suppress the government's My[S]pace evidence" because there was no violation of 18 U.S.C. § 2703.  (Doc. 737 at 18.)  Also, based on statements made in Williams's affidavit, the government describes Williams's decision against moving to suppress the MySpace evidence as "an entirely reasonable decision[,] . . . given the breadth of the evidence against Aguiar."  (*Id.* at 19.)  The government further argues that, even if Williams had moved to suppress the MySpace evidence and it had been suppressed, "the absence of the My[S]pace evidence from the trial would not have changed the outcome," given that it was "a very very small part of the overall case."  (*Id.*)

An attorney's failure to file a suppression motion may provide the grounds for a valid ineffective-assistance-of-counsel claim.  *See Kimmelman*, 477 U.S. at 375.  "When alleging that an attorney was deficient regarding a motion to suppress, the petitioner must show that[:] (1) a competent attorney would have made the proper motion, (2) . . . the

---

[14]  In his "Declaration," Aguiar indicates that he "set [his] user profile account settings to 'private.'"  (Doc. 751-1 at 2.)  Because the public/private setting does not affect the statutory analysis below, the Court need not address this issue.

motion would have been granted[,] and (3) . . . the outcome of the petitioner's trial would have been different."  *Harrison v. Smith*, No. 05 Civ. 5953(JGK), 2012 WL 3822211, at *6 (S.D.N.Y. Sept. 4, 2012); *see also United States v. Matos*, 905 F.2d 30, 32 (2d Cir. 1990) ("In order to show ineffective assistance for the failure to make a suppression motion, the underlying motion must be shown to be meritorious, and there must be a reasonable probability that the verdict would have been different if the evidence had been suppressed." (citing *Kimmelman*, 477 U.S. at 375–76)).  The question of whether a motion would have been "meritorious" is central to both prongs of the *Strickland* analysis.  *See Maldonado v. Burge*, 697 F. Supp. 2d 516, 525 (S.D.N.Y. 2010) ("The requirement that the underlying suppression motion be 'meritorious' [is] relevant to the prejudice prong of *Strickland*, [and] it is also relevant to the performance prong in that counsel's failure to make a suppression motion that is obviously non-meritorious cannot be said to constitute deficient performance.")

Aguiar argues that by obtaining MySpace records by means of a subpoena, law enforcement violated 18 U.S.C. § 2703(a), Federal Rule of Criminal Procedure 41, the Fourth Amendment, and Aguiar's reasonable expectation of privacy.  (Doc. 723-1 at 24.) Beyond a handful of passing references to "Fourth Amendment," "reasonable expectation of privacy," and "Federal Rule of Criminal Procedure 41," Aguiar provides no specific facts or case law to support his position.  Unsupported assertions with no basis in fact are insufficient to state a claim under § 2255.  *See Belloso-Ibarra v. United States*, No. 09 Civ. 8216(SAS), 2010 WL 431904, at *5, *5 n.55 (S.D.N.Y. Feb. 8, 2010) (conclusory allegations cannot sustain claim under § 2255).

The only remaining ground for Aguiar's argument, therefore, is 18 U.S.C §

2703(a): Aguiar argues that, because law enforcement subpoenaed MySpace records that

were less than 180 days old—a period set forth in § 2703(a)—law enforcement should

have obtained a warrant.  (*Id.*)[15]  Section 2703(a) is a provision of the Stored

Communications Act (SCA), an act that "was passed as part of the Electronic

Communications Privacy Act of 1986."  *United States v. Scully*, 108 F. Supp. 3d 59, 75–

76 (E.D.N.Y. 2015).  "The [SCA] has a narrow list of remedies, and . . . suppression is

not among them."  *United States v. Guerrero*, 768 F.3d 351, 358 (5th Cir. 2014) (finding

SCA violation but no suppression remedy where "government obtained the data from

state officials who themselves had used a subpoena, not a Section 2703(d) order"); *see*

*also Scully*, 108 F. Supp. 3d at 88 (noting damages and criminal punishment available as

remedies under SCA).  "Section 2708 of the SCA provides that '[t]he remedies and

sanctions described in this chapter are the only judicial remedies and sanctions for

nonconstitutional violations of this chapter.'"  *Id.* at 88 (quoting 18 U.S.C. § 2708).

Accordingly, a suppression motion is not available as a remedy where a petitioner asserts

a statutory violation: "[t]he SCA affords no suppression remedy for non-constitutional

violations [and, therefore,] even if [the Defendant could show] a violation of the statute,

exclusion would not be the appropriate remedy."  *Id.* (alterations in original) (internal

quotation marks omitted).

---

[15]  Under § 2703(a), if a warrant is required, the government also must comply with Rule 41.

In light of this statutory remedy, the Court need not address whether law enforcement violated § 2703(a) by obtaining records that purportedly were less than 180 days old.  Nor is the Court required to address whether the exclusionary rule applies to the "direct and derivative evidence."  If Williams had filed a motion to suppress the MySpace evidence based on violations of § 2703(a), the motion would not have been successful because suppression is not a remedy under the SCA for nonconstitutional violations.  Absent a showing that the suppression motion would have been successful, Aguiar's ineffective-assistance argument fails.

Assuming *arguendo* that a motion to suppress would have been successful, Aguiar fails to satisfy the prejudice prong of *Strickland*, given that the evidence against Aguiar at trial was overwhelming.  The evidence included significant drug and currency seizures, devastating recordings, and coconspirator testimony, all of which was corroborated by surveillance and a financial investigation.  Aguiar asserts that the MySpace evidence led to the development of the other significant evidence, but Aguiar has the burden of proof on the claims raised in his Motion, *see Napoli*, 45 F.3d at 683, and his conclusory assertions fall short.

### B. Failure to Argue that the District Court Lacked Jurisdiction to Authorize (1) Law Enforcement's Installation of Pen Register and Trap and Trace Devices, and (2) Collection of Cell-Site Data

Next, Aguiar makes several arguments regarding the pen/trap applications and orders.  First, he asserts that Attorney Williams should have moved to suppress the evidence collected pursuant to the pen/trap orders because the evidence was collected in Massachusetts, "outside the territorial jurisdiction of the court."  (Doc. 723-1 at 29; *see*

*also id.* at 30–31.)[16]  Second, he asserts that the cell-site-location data that was collected

pursuant to the same court orders also "should have been suppressed."  (*Id.* at 37–38.)  In

particular, he claims that Judge Sessions made it clear that the government was required

to obtain warrants to collect the cell-site-location data, and after Judge Sessions's ruling

on the Motion in Limine (*see* Doc. 449), Williams should have filed a suppression motion

on the grounds that the cell-site-location data was unlawfully collected in Massachusetts,

outside of the jurisdiction of the authorizing court.  (Doc. 723-1 at 31–37.)

The government claims Aguiar's jurisdictional argument is "baseless" because the

statute that authorizes pen/trap devices permits a court to authorize information collection

in any state, as long as certain conditions are met.  (Doc. 737 at 20.)  Even if there had

been a defect, the government argues, suppression would not have been the proper

remedy because pen/trap devices "do not 'implicate important . . . Fourth Amendment

interests.'"  (*Id.* at 21 (quoting *Smith v. Maryland*, 442 U.S. 735, 741–46 (1979)).)  The

government adds that Williams moved to suppress cell-site-location data.  (*Id.* at 20.)

Williams states in his affidavit that he did not move to suppress "the information

obtained from the pen registers and trap and trace devices on the basis that the district

court lacked jurisdiction" because he "researched the issue and found no legal support for

it."  (Doc. 737-1 at 1.)

---

[16]  Although Aguiar states that the data was collected pursuant to "warrants" (*see, e.g.*, Doc. 723-1 at 29), in fact, it was collected pursuant to court orders (*see, e.g.*, *In re Tahair*, No. 2:09-mc-34, ECF Nos. 1, 2), and therefore I refer to them as such here.

### 1.    Pen/Trap Orders

Aguiar's argument regarding the suppression of pen/trap data on jurisdictional grounds fails for multiple reasons.  First, Aguiar provides scant support for his assertion that the pen/trap data was collected "outside the court's territorial jurisdiction." (Doc. 723-1 at 30 (citation omitted).)  The most relevant discussion appears in a footnote stating that his attorney "failed to argue pen/trap warrants were facially invalid because they did not specify the subscriber or location of the pen/trap installations in violation of 18 U.S.C. §§ 3123(b)(1)(A) and (b)(1)(C)."  (*Id.* at 36 n.6)  To the extent Aguiar is arguing that Williams should have filed a suppression motion based on statutory defects of the pen/trap applications, the motion would have failed because suppression is not available for statutory defects such as these.  *See Stegemann*, 40 F. Supp. 3d at 270–71.

The Electronic Communications Privacy Act (ECPA) governs the use of pen/trap devices, *id.* at 270, and "[a]s with the SCA . . . use of pen register and trap and trace devices in violation of the ECPA does not implicate the Fourth Amendment. Accordingly, '[s]uppression of evidence is not a remedy for alleged violations of the ECPA.'"  *Id.* at 270–71 (internal citations omitted) (quoting *United States v. Navas*, 640 F. Supp. 2d 256, 262 (S.D.N.Y. 2009)).  An objection to the pen/trap devices on statutory grounds would have been futile.  *See Wearing v. Lavalley*, No. 10–CV–8307 (JPO), 2015 WL 6738327, at *3 (S.D.N.Y. Nov. 4, 2015) ("[L]ittle would have resulted from an objection [by counsel] on statutory grounds."), *appeal filed*, 2015 WL 6738327 (2d Cir. May 2, 2016) (No. 16-1385).

Alternatively, assuming a motion to suppress had been available as a remedy, Aguiar still fails to show that Williams did not act in a reasonably competent manner. "[A] lawyer's decision not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision." *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *DeLuca*, 77 F.3d at 588 n. 3). In his affidavit, Williams articulates a reasonable justification for his decision regarding Aguiar's jurisdictional argument.  (*See* Doc. 737-1 at 1.)  The Court should defer to his strategic judgment.  *See Al Kassar v. United States*, Nos. 13 Civ. 3541(JSR)(JLC), 07 Cr. 354(JSR), 2014 WL 1378772, at *10 (S.D.N.Y. Apr. 8, 2014) (internal quotation marks omitted) (listing cases in which courts credit "credible" attorney affirmations over "self-serving allegations" by defendant (quoting *Castrillo v. Breslin*, No. 01 Civ. 11284 GBD GWG, 2005 WL 2792399, at *14 (S.D.N.Y. Oct. 26, 2005))).

Moreover, Williams aggressively litigated other nonfrivolous arguments surrounding the pen/trap orders and subsequent data collection.  Under *Strickland*'s first prong, "it is not sufficient for the habeas petitioner to show merely that counsel omitted a nonfrivolous argument.  Counsel is not obliged to advance every nonfrivolous argument that could be made."  *Aparicio*, 269 F.3d at 95 (citing *Evitts*, 469 U.S. at 394).  Assuming Aguiar's jurisdictional argument is "nonfrivolous," Williams's failure to advocate it still does not meet the high *Strickland* bar.  Initially, Williams moved to suppress evidence collected pursuant to the April 3, 2009 pen/trap order and any evidence "derived from it." (Doc. 171 at 3, 4.)  Also, Williams requested that the court "review all of its Orders for Installation and Use of a Pen Register and Trap and Trace Device, dated April 3, 2009,

April 14, 2009, May 8, 2009, June 5, 2009, June 17, 2009[,] and June 23, 2009 to

determine whether the Government's applications offer sufficient reliable information to

meet the probable cause standard."  (Doc. 284 at 1.)  Although not directly related to the

non-cell-site-location information, the request for a probable-cause review addressed

perhaps the most vulnerable component of the pen/trap applications.  Given the unsettled

state of the law surrounding cell-site-location data when this case was pending, Williams

made logical and strategic calculations in choosing which suppression arguments to

advance.  (*See* Doc. 449 at 4 (explaining that decisions related to cell-site-location

information and probable cause standard are "mixed" and Second Circuit "has yet to

answer this question").)  And Williams was successful to a certain extent: eventually, the

Court conducted a probable-cause review of all those pen/trap applications.  However,

the Court found the requisite probable cause and ruled that the cell-site-location

information was admissible.  Despite the apparent setback, Williams diligently pursued a

direct appeal of admission of the evidence derived from the April 3, 2009 pen/trap

application.  (Appellant's Corrected Brief at 35, *Aguiar*, 737 F.3d 251, ECF No. 161

(Case No. 11-5262)).

This record demonstrates that Williams challenged the data collected pursuant to

the pen/trap orders in multiple ways, and the Court need not reach the question of

whether Aguiar's proposed jurisdictional argument has merit.  Courts are "reluctant to

second guess matters of trial strategy simply because the chosen strategy has failed."

*United States v. Aulet*, 618 F.2d 182, 189 (2d Cir. 1980).  Moreover, "courts must allow

trial counsel some latitude in deciding which pretrial motions are called for in a given

case." *Id.* (citing *United States v. Ritch*, 583 F.2d 1179, 1182–83 (1st Cir. 1978)).

Granting Williams such latitude, it is evident that his performance was objectively

reasonable and grounded in sound strategy.  Under *Strickland*, Williams was not required

to move to suppress pen/trap data on the jurisdictional grounds advanced by Aguiar here.

Nor did *Strickland* require Williams to pursue that precise issue on appeal.  Rather, it was

sufficient for Williams to have appealed a different but related issue regarding one

pen/trap order.  *See Santiago v. McGinnis*, No. CIV. 00–5870(LBS), 2002 WL 31946709,

at *6 (E.D.N.Y. Oct. 21, 2002) ("This process of 'winnowing out weaker arguments on

appeal and focusing on' those more likely to prevail, far from being evidence of

incompetence, is the hallmark of effective appellate advocacy." (quoting *Smith v.

Murray*, 477 U.S. 527, 536 (1986))).

## 2.    Cell-Site-Location Data

Aguiar next argues that following Judge Sessions's ruling on the Motion in

Limine, Williams should have moved for suppression of the cell-site-location data—

which, he also asserts is "content data" and protected by the Fourth Amendment—on the

basis that the collection of the cell-site-location data took place outside of the jurisdiction

of the authorizing court, rendering its collection unconstitutional and a violation of Rule

41(b).  (Doc. 723-1 at 34–37; Doc. 751 at 7.)  He contends that "this Court indicated

Movant's Fourth Amendment rights had been violated as to cell-site data" and Williams

"had an obligation to further his suppression arguments as to the jurisdiction and other

40

remedies under Rule 41's Fourth Amendment protections applied by Judge Sessions." (Doc. 723-1 at 38.)  He also claims prejudice because Williams did not "object at trial to the introduction of location data."  (*Id.* at 39.)

These arguments fail.  Even though Williams did not move to suppress the pen/trap evidence on the grounds that the collection of cell-site-location data took place outside the authorizing court's jurisdiction, he repeatedly challenged the collection of cell-site-location data on other justifiable grounds.  For example, Williams advanced the same argument that Aguiar now makes in his § 2255 Motion: that cell-site-location data is "protected by the [Fourth] Amendment and therefore require[s] a probable cause warrant under Fed. R. Civ. P. 41."  (Doc. 284 at 7.)  As noted above, Williams requested a probable-cause review of all the pen/trap applications.  (*Id.*)  When the Court found probable cause existed, Williams was not obligated to pursue another motion to suppress, as under *Strickland*, attorneys are not required to advance every possible argument.  And even assuming the jurisdictional argument was valid, Williams's failure to pursue it did not amount to an "'error[] so serious that [he] was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'"  *Wilson v. Mazzuca*, 570 F.3d 490, 502 (2d Cir. 2009) (quoting *Strickland*, 466 U.S. at 687).

Lastly, Williams's failure to object at trial to the introduction of cell-site-location data was not deficient or prejudicial.  (*See* Doc. 723-1 at 39.)  The Court granted the government's Motion in Limine, ruling the government could admit cell-site data at trial. (Doc. 449.)  Williams's opposition to the Motion preserved the issue for appeal.

Therefore, Williams effectively represented Aguiar at trial and on appeal, and the Court need not address Aguiar's proposed suppression motion or *Strickland*'s prejudice prong with respect to Aguiar's jurisdictional arguments. *See Taylor v. Rivera*, No. 07 Civ. 8668(PKC)(DF), 2011 WL 4471919, at *21(S.D.N.Y. Apr. 18, 2011) (discussing attorney's performance, rather than merits of proposed suppression argument; noting that attorney raised a related, but slightly different, suppression argument; and finding choice to be strategic and not constitutionally deficient); *see also Greiner*, 417 F.3d at 319 ("[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." (alterations in original) (quoting *Strickland*, 466 U.S. at 697)).

### C. Failure to Move to Suppress Wiretap Evidence Because the Court Lacked Jurisdiction to Issue Title III Warrants

Aguiar contends that Attorney Williams should have moved to suppress, on jurisdictional grounds, wiretap evidence collected pursuant to Title III warrants. (Doc. 723-1 at 40–42.) He asserts that his "mobile phones were not within the territorial jurisdiction of this Court as represented by the government when Title III applications were made and warrants issued and executed." (*Id.* at 40.) In particular, he states that the phones were not within the Court's jurisdiction at the time of the June 3 and July 21 warrants. (*Id.*) Aguiar also argues that the government "misled the court" (*id.* at 42), by indicating that Aguiar's "calls were being rerouted to Vermont" and not "intercepted, redirected to, and acquired by VOICEBOX in Massachusetts" (*id.* at 45).

42

The government argues that Williams acted properly in declining to file such a motion because there was no evidence that the wiretap communications were heard in Massachusetts.  (Doc. 737 at 21–22.)  Williams states he did not file a suppression motion on this basis because, after researching the issue, he found "there was no legal support for it."  (Doc. 737-1 at 1.)

Although Williams did not move to suppress the wiretap evidence on the grounds specified in Aguiar's § 2255 Motion, he *did* move to suppress the wiretap evidence—that was gathered pursuant to the June 3, June 18, July 2, and July 21 Title III warrants—on many other grounds.  Williams's performance therefore satisfies *Strickland*'s performance prong.  For instance, Williams argued that the four warrant applications "failed to establish that alternative investigative techniques would not succeed."  (Doc. 171 at 1.)  He also argued all of the following: (1) the "Government's application for the July 2, 2009 warrant did not comply with the requirements of Title III" due to a missing page in the authorization memo; (2) the government did not provide Aguiar with timely notice that he had been subject to the June 3 wiretap; (3) the government intercepted wiretap communications before it was authorized to do so by the Court's July 2 order; (4) the government did not immediately seal the interceptions made pursuant to the June 3, July 2, and July 21 orders; (5) the government did not explain why the June 18 wiretap was not successful when it applied for an extension on July 21; and (6) the government "intercepted calls [Aguiar] made to his attorney on July 6, 2009 . . . and prosecutors failed to report those interceptions to the Court in their Ten Day Reports filed on July 10,

2009 and July 20, 2009." (*Id.*)  The record demonstrates that Williams challenged the legality of the four wiretap warrants in many ways and was justified in not raising the jurisdictional argument because, as stated in his affidavit, he researched the argument but found no support for it.  *See Oppedisano v. United States*, No. 13–CV–0161(JS), 2013 WL 4052828, at *3 (E.D.N.Y. Aug. 12, 2013) ("[I]t is sufficient that counsel exercised professional discretion in deciding whether there [were] sufficient grounds to file a motion." (second alteration in original) (quoting *United States v. DiTommaso*, 817 F.2d 201, 215 (2d Cir. 1987))).

Accordingly, Williams provided professional legal assistance to Aguiar, making multiple nonfrivolous arguments related to the wiretap evidence in Aguiar's case before the trial court, and then appropriately narrowing those issues on appeal.  Because Williams sought relief for his client by numerous other avenues, the merits of Aguiar's proposed suppression motion need not be reached.  *See Marcial v. Ercole*, No. 08–CV–06188T, 2010 WL 3303841, at *5 (W.D.N.Y. Aug. 19, 2010) ("To the extent that trial counsel pursued numerous avenues of pre-trial relief, the Court cannot conclude that trial counsel's decision not to challenge . . . the search warrants and to seek suppression of the physical evidence . . . fell outside the category of 'omissions by counsel that might be considered sound trial strategy.'" (quoting *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005))); *see also Taylor*, 2011 WL 4471919, at *21.

**D.    Failure to Move to Suppress June 3, June 18, and July 2 Title III Warrants Under *Franks* or to Assert Meritorious Arguments that Government Did Not Meet 18 U.S.C. § 2518's Necessity Requirement**

Aguiar next raises a series of claims concerning the affidavits that supported three of the Title III wiretap warrants.  Aguiar's principal argument is that Williams was ineffective for failing to pursue a hearing and suppression of wiretap evidence under *Franks v. Delaware*, 438 U.S. 154 (1978).  (Doc. 723-1 at 46, 66.)  He also argues that Williams failed to assert: (1) the "obvious" necessity argument (*id.* at 47); (2) that the affidavits in support of the June 3, June 18, and July 2 warrants contained misrepresentations and omissions which were material to the Court's finding of necessity and probable cause (*id.* at 48); (3) that the misrepresentations in the affidavits violated the "particularity warrant requirement" (*id.* at 52); and (4) that successive Title III warrant applications did not satisfy the necessity requirement on their own (*id.* at 48), presenting "carbon copy necessity arguments" of prior applications (*id.* at 67) and not pausing "to consider normal investigation" (*id.* at 65).

**1.    Necessity**

I first address the first and fourth claims listed above, as they relate most directly to the manner in which Williams argued, or failed to argue, the necessity issue.  Aguiar claims Williams raised a "groundless" and "inexcusable" necessity argument (*id.* at 46–47), but failed to raise "the obvious argument . . . that well[-]established authority required that the government had made a 'good faith' effort to pursue conventional investigative methods before resorting to wiretapping" (*id.* at 47 (quoting *United States v.*

*Hoffman*, 832 F.2d 1299, 1306–07 (1st Cir. 1987)), and law enforcement must accurately describe the "'progress'" of and the "'difficulties'" associated with normal investigative methods (*id.* (quoting *United States v. Hinton*, 543 F.2d 1002, 1011 (2d Cir. 1976))).  He also suggests that Williams was ineffective for failing to argue that each successive Title III warrant circumvented the necessity requirement.  (*Id.* at 48, 67.)

The government provides only a general response: "Attorney Williams did, in fact, argue that the wiretap affidavits lacked the requisite showing of necessity," and he "raised the issue again" at the hearing on the initial motion to suppress.  (Doc. 737 at 22.) Williams concurs, stating that he argued the necessity issue but the Court denied his motion to suppress.  (Doc. 737-1 at 1.)

"Title III" wiretap applications must be supported by a showing of "necessity" under § 2518(1)(c) of Title 18.  "Title III requires each application for a wiretap to include a 'a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.'"  *United States v. Levy*, No. 1:(S5) 11 Cr. 62(PAC), 2012 WL 5830631, at *3 (S.D.N.Y. Nov. 16, 2012), *aff'd*, 626 F. App'x 319 (2d Cir. 2015) (quoting 18 U.S .C. § 2518(1)(c)).  "This 'necessity' requirement 'is designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'"  *Id.* (quoting *United States v. Serrano,* 450 F. Supp. 2d 227, 236 (S.D.N.Y. 2006)).

Here, Williams's performance fell within the wide range of professional competence under *Strickland*'s performance prong.  The record demonstrates that Williams raised the necessity issue, as it related to all Title III warrants, and litigated it fully.  First, Williams argued for suppression of all wiretap evidence on the basis that the "Title III warrants do not adequately explain why normal and less intrusive investigative methods would fail [to] uncover evidence . . . ."  (Doc. 171 at 6.)  Williams then pressed the necessity issue at the August 4, 2010 motions hearing.  (Doc. 624 at 18–22, 55–76.)  At the hearing, the government called Agent Couture to the stand, and the agent testified about the investigative techniques used in the Aguiar investigation—including "undercover agents" (*id.* at 57), "confidential sources" (*id.* at 58), "[l]ive and GPS surveillance" (*id.* at 58–59), and "grand jury subpoenas" (*id.* at 60)—and techniques not used during the investigation—including "search warrants" (*id.* at 59–60) and jail informants (*id.* at 61).  The agent then detailed the limitations of those techniques.  (*Id.* at 55–63.)  After the direct examination, Williams cross-examined Agent Couture, questioning the agent about his wiretap applications (*id.* at 63, 67) and specific investigative tactics that had not been pursued (*id.* at 67, 68, 70).  After taking the motion under advisement, the Court denied Aguiar's motion holding that "the Government satisfied the necessity requirement."  (Doc. 371 at 14.)

This record shows that Williams presented a "necessity" challenge very similar to that which Aguiar claims he did not pursue.  It is true Williams never explicitly referred to the phrase "good faith efforts," but Williams's cross-examination scrutinized law

enforcement's efforts to pursue other investigative tactics, and he uncovered no evidence of bad faith in those tactics.[17]  Moreover, the mere existence of alternative arguments does not affect the ultimate *Strickland* analysis: "An attorney who makes a strategic choice that is not persuasive to a court does not render constitutionally ineffective assistance simply because, with the benefit of time and hindsight, other strategies can be identified that might have been successful."  *Savinon v. Mazucca*, 318 F. App'x 41, 44 (2d Cir. 2009).  As noted above, *Strickland*'s performance prong does not require an attorney to raise every possible nonfrivolous argument.  Accordingly, Aguiar's claim of ineffective assistance due to Williams's failure to properly argue necessity is meritless.

### 2.    Particularity

Aguiar further asserts that misrepresentations in the affidavits affected the "particularity warrant requirement."  (Doc. 751 at 9; Doc. 723-1 at 52.)  He states, "[t]he Couture affidavits plainly did not *accurately* describe with *particularity* the investigative procedures that were tried and failed, or why they appeared too dangerous or unlikely to succeed under §§ 2518(1)(c) and (3)(c)."  (Doc. 723-1 at 50 (emphasis added).)  He then states that the "DEA failed to meet the *particularity warrant requirement* by failing to *accurately* report the application of GPS technology in the June 3, and June 18, 2009 Title III affidavits."  (*Id.* at 52 (emphasis added).)  He also refers to the phrase "GPS tracking" in an affidavit as "boilerplate" language.  (*Id.* (citation omitted).)

---

[17]    Although not bound by Aguiar's reference to "good faith efforts" under First Circuit precedent (*see* Doc. 723-1 at 47 (quoting *Hoffman*, 832 F.2d at 1306)), I apply it here because even under that standard, Aguiar's argument fails.

Aguiar does not support a "particularity" argument, and he misapplies the legal principle. The particularity requirement is intended to prohibit warrants that are "vague and open-ended," or "boilerplate." *See United States v. Cohan*, 628 F. Supp. 2d 355, 361 (E.D.N.Y. 2009). Though Aguiar uses the word "boilerplate," his simultaneous references to "accurate" reporting demonstrate that he is concerned primarily with the purported misrepresentations and inaccuracies, not vagueness. Thus, Aguiar's purported "particularity" argument fails.

### 3.    *Franks*

Aguiar asserts that Attorney Williams's performance was deficient "by failing to move to suppress the June 3, June 18, and July 2, 2009 Title III Warrants under *Franks v. Delaware*, 438 U.S. 154 (1978)." (Doc. 723-1 at 46.) He states that Williams "should have been aware that the supporting affidavits contained deliberate false statements, omissions, and reckless disregard for the truth, which were material to the finding of both necessity and probable cause." (*Id.*) The purported misrepresentations included "the role of GPS and cell phone tracking and the viability of informants" (*id.* at 50), among others (*id.* at 54–61). The government broadly asserts "there was no evidence to support the request for a Franks hearing for the wiretap affidavits which is why [Attorney Williams] did not request one." (Doc. 737 at 23.)

In *Franks v. Delaware*, the U.S. Supreme Court held as follows: "the Fourth Amendment entitles a defendant to a hearing if he or she makes a 'substantial preliminary showing' that a deliberate falsehood or statement made with reckless disregard for the truth was included in the warrant affidavit and the statement was necessary to the judge's

finding of probable cause." *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008)

(quoting *Franks*, 438 U.S. at 155–56, 170–71). The Second Circuit applies *Franks* to

findings of necessity as well. *See United States v. Rajaratnam*, 719 F.3d 139, 146

(2d Cir. 2013). Under *Franks*, in order to suppress evidence that was "obtained pursuant

to an affidavit containing erroneous information, the defendant must show that: (1) the

claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or

reckless disregard for the truth; and (2) the alleged falsehoods or omissions were

necessary to the [issuing] judge's probable cause [or necessity] finding.'" *Id.* (alterations

in original) (quoting *United States v. Canfield*, 212 F.3d 713, 717–18 (2d Cir. 2000)).

"[T]he ultimate inquiry is whether, after putting aside erroneous information and

[correcting] material omissions, there remains a residue of independent and lawful

information sufficient to support [a finding of] probable cause [or necessity]." *Id.*

(second, third, and fourth alterations in original) (quoting *Canfield*, 212 F.3d at 718).

Although Aguiar is correct that Williams did not pursue a hearing or challenge the

June 3, June 18, and July 2, 2009 Title III warrants under a *Franks* theory,[18] Williams

justifies the decision by stating that "the evidence in the case did not support such a

motion." (Doc. 737-1 at 2.) Again, "strategic choices made after thorough investigation

of law and facts relevant to plausible options are virtually unchallengeable." *DeLuca*, 77

F.3d at 588 (quoting *Strickland*, 466 U.S. at 690). Even if an affiant made mistakes, a

petitioner must show "deliberate falsehoods." *Rajaratnam*, 719 F.3d at 146. Absent a

---

[18]   It appears from the record that all codefendants sought a *Franks* hearing with regard to the April pen/trap application only. (*See* Doc. 216.)

showing that Agent Couture *knowingly* made omissions or misstatements, Aguiar's argument fails and he does not meet his burden of proof on this claim.  *See Polizzi v. United States*, 926 F.2d 1311, 1321 (2d Cir. 1991) ("[T]he petitioner generally bears the burden of proof throughout the habeas proceeding.").[19]

### E.   Failure to Present Exculpatory Evidence in Support of Motion to Suppress Evidence Found Pursuant to April 3, 2009 Pen/Trap Order

Next, Aguiar argues that Williams failed to present "exculpatory evidence" to show that "Agent Couture intentionally acted with reckless disregard for the truth in his April 3, 2009 pen/trap affidavit as to the 617-549-2915 target cell phone" (Doc. 723-1 at 68–69), and that, "[h]ad counsel adequately presented compelling and available record evidence to support his claim, this Court would have granted Movant a <u>Franks</u> hearing" (*id.* at 69).  Aguiar also claims that there were other "intentional false statements" and misrepresentations in the affidavit (Doc. 751 at 11), and Williams should have raised those as well (*id.* at 10–12).  He asserts that these other "false statements," along with other examples of prejudice, would have been exposed had Aguiar been granted a *Franks* hearing.  (*Id.* at 74 n.16, 75).

In response, the government points out that both parties litigated the mistaken-phone-number issue before the District Court and again on appeal.  (Doc. 737 at 23.) Williams reiterates that point: "I exhaustively litigated Agent Couture's misstatement regarding the phone number in the April 3, 2009 affidavit . . . ."  (Doc. 737-1 at 2.)

---

[19]  The Court need not discuss the roughly 50 misrepresentations that Aguiar claims were included in the affidavit supporting the June 3 wiretap application (*see* Doc. 723-1 at 54–61), given that the truth or falsity of each would not change the *Strickland* analysis of Williams's performance.

I find that Williams's representation of Aguiar was not ineffective on this ground. Also, Aguiar's claim relating to the other "false statements" and misrepresentations fails because Aguiar has not shown any deliberate misstatements. *See Rajaratnam*, 719 F.3d at 146. The record, including William's affidavit, reveals that Williams's performance before trial and on appeal was consistent with prevailing professional norms. Williams litigated the mistaken phone number extensively. (*See id.* at 2.) He raised an issue (in a motion to suppress) regarding the mistaken phone number in the April 3, 2009 pen/trap order, and did the same as part of the direct appeal. (*See* Appellant's Corrected Brief at 23, *Aguiar*, 737 F.3d 251, ECF No. 161 (Case No. 11-5262)). Notably, Judge Sessions agreed that there was a mistake in Agent Couture's affidavit that supported the April 3, 2009 order. (Doc. 371 at 28.) Still, the District Court found that the challenge to the affidavit had no merit because the *Franks* standard was not met (*id.* at 27), and the affidavit satisfied the requisite showing without the mistaken number (*id.* at 28). The Second Circuit agreed:

> [E]ven if the false statement were stricken from the affidavits, the affidavits are replete with information regarding controlled purchases of cocaine, in-person surveillance of Aguiar's travels and the use of multiple "burn" cell phones to conduct business among the target subjects—all of which would satisfy the necessary grounds to issue a hybrid order.

*Aguiar*, 737 F.3d at 263. The *Strickland* performance standard did not require Attorney Williams to further litigate this issue by presenting additional "exculpatory evidence" to the Court. Even if additional evidence had been available, "*Strickland* does not guarantee perfect representation." *Harrington*, 562 U.S. at 110.

Furthermore, Aguiar fails to establish prejudice because it is unclear how "exculpatory evidence" would have changed the outcome of the case.  The District Court and Second Circuit agreed that the affidavit provided independent grounds to issue the order, even without the incorrect phone number.  Had Aguiar met the preliminary showing for a *Franks* hearing, and had the District Court held a hearing and subsequently removed the incorrect statement from the affidavit, Judge Sessions still would have granted the April 3 pen/trap application.  Thus, Williams's purported failure to raise the issue in the manner now advanced by Aguiar did not prejudice Aguiar's case.[20]

### F.   Failure to Act Immediately After Government Neglected to Provide Defense with Complete Copies of the June 3 and July 2, 2009 Warrants Ten Days Prior to Aguiar's Detention Hearing

Aguiar next argues that Attorney Williams was ineffective "by failing to take immediate action [after] or argue that the government violated 18 U.S.C. § 2518(9) and his due process rights because prior to his court hearings, [the government] had not provided the defense with a complete copy of the June 3, or July 2, 2009 Title III wiretap warrants."  (Doc. 723-1 at 75.)  In particular, Aguiar claims the government violated § 2518(9)'s ten-day notice requirement when, less than ten days before Aguiar's detention hearing, the government failed to give Aguiar both the "primary" June 3 warrant and the complete copy of the July 2 warrant.  (*Id.* at 76–78.)  He then appears to assert that

---

[20]  Aguiar faults Williams for not presenting the following to the Second Circuit: "that phone records and Agent Couture's trial testimony proved he was aware that the 2915 phone was not material to DEA's investigation, located in Massachusetts, and not calling Vermont phones from after October 2008 through his April 2009 pen/trap application."  (Doc. 723-1 at 74.)  Again, had this information been presented, there is no indication that the motions to suppress would have been granted, especially given that the Second Circuit found the pen/trap order to be sufficiently supported without the incorrect number.

wiretap evidence or "derivative evidence" was introduced at his detention hearing.  (*See id.* at 78 ("[N]o Title III evidence should have been admitted at defendants' detention hearings . . . .").)  He argues that he was prejudiced by Williams's failure to raise this § 2518(9) violation because the government was subsequently able to gain many advantages, including the detention of Aguiar, through its use of wiretap evidence and/or "derivative evidence."  (*Id.*)  He also asserts that Williams's failure to act immediately after learning of the July 2 warrant's missing page from the DOJ authorization memo was deficient and prejudicial because the original copy of the warrant was destroyed.  (*Id.* at 77, 79.)[21]

The government responds in part by stating that Williams litigated "the notice issue" with respect to the June 3 warrant and argued at length about the missing authorization page for the July 2 warrant.  (Doc. 737 at 24–25.)  The government does not address Aguiar's specific argument regarding § 2518(9) and "derivative evidence," although it asserts that "the same reasoning and result" of prior proceedings, with respect to "notice," should apply here.  (*Id.* at 24.)  It also asserts that a speedier filing of a motion to suppress would not have affected the Court's ruling on the missing-authorization-page issue.  (*Id.* at 25.)

---

[21] In his Reply, Aguiar asserts that the alleged § 2518(9) violations, and their factual bases, were "deemed admitted" under Federal Rule of Civil Procedure 8.  (Doc. 751 at 13.)  But because Rule 8 applies only to pleadings, it has no relevance here.  Also, Aguiar provides no support for a due process violation.  Thus, I address only the § 2518(9) argument.

Williams describes his strategy for challenging the missing authorization page as follows:

> First, Mr. Aguiar never asked me to take 'immediate action' with regard to the DOJ authorization issue and when I did learn about the missing authorization, I filed a timely motion to suppress. Second, as the motion to suppress hearing transcript shows and the district court's ruling on the motion to suppress makes clear, the district court was not concerned with what had occurred in the clerk's office.

(Doc. 737-1 at 2.) Williams adds that the Court was focused on whether there had been authorization from the DOJ for the warrant and whether the government presented evidence "which showed that it had obtained DOJ authorization prior to presenting the wiretap application to the court." (*Id.*) Williams did not address his strategy for challenging the "notice" requirement of the June 3 warrant.

Subsection (9) of § 2518 mandates that the contents of intercepted wire communications will not "be received in evidence or otherwise disclosed in any trial, hearing, or other proceeding . . . unless each party, not less than ten days before the trial, hearing, or proceeding, has been furnished with a copy of the court order, and accompanying application, under which the interception was authorized or approved." 18 U.S.C. § 2518(9). Under § 2518(9), a detention hearing qualifies as a "proceeding." *See United States v. Orena*, 883 F. Supp. 849, 854 n.2 (E.D.N.Y. 1995) ("The government failed to comply with [18 U.S.C. § 2518(9)] before offering evidence seized pursuant to the District of New Jersey search warrants at Petrizzo's detention hearing."); *United States v. Salerno*, 794 F.2d 64, 70 (2d Cir. 1986), *rev'd on other grounds*, 481 U.S. 739 (1987).

Considering this law, and having listened to a recording of Aguiar's August 5, 2009 detention hearing, I find that there was no violation of the statute. Aguiar's assertion that the wiretap evidence was used at his detention hearing is mistaken. The government's Motion for Detention was granted as unopposed, as Aguiar was also serving a term of federal supervised release for a prior federal conviction at the time of the alleged offenses. Moreover, the government did not disclose or otherwise use the wiretap evidence at the hearing, and the Court made no reference to Title III in its findings. The record therefore establishes that the government did not violate § 2518(9) at Aguiar's detention hearing. The government was not required to give the defense copies of the warrants at least ten days before the detention hearing because no wiretap evidence was introduced at that hearing. "Failure to raise frivolous arguments does not give rise to ineffective assistance of counsel." *Hiraldo v. United States*, No. 05 CV 0760(SJ), 2006 WL 1794775, at *6 (E.D.N.Y. June 7, 2006). Accordingly, Williams acted reasonably by not raising the § 2518(9) issue in a motion to suppress or taking other "immediate" action. It also would have been futile to challenge, on these same grounds, other uses of "derivative" wiretap evidence.

Lastly, Williams's failure to act "immediately" when he learned of the missing authorization page was not unreasonable. Rather, the filing of a motion to suppress was a reasonable strategy. Moreover, Williams challenged the July 2 warrant throughout the pretrial and appellate stages of litigation. Aguiar has not presented any other, more "immediate," actions that Williams should have taken.

**G.      Failure to Adequately Investigate or Argue Exculpatory Facts to Prove Government Misconduct in July 2, 2009 Warrant Authorization**

Aguiar next faults Williams for "wait[ing] until March 9, 20[10] to file his suppression motion," after learning about the missing DOJ authorization page for the July 2 warrant application.  (Doc. 723-1 at 80.)[22]  Aguiar also states that Williams "failed to adequately investigate the matter, call any witnesses, or argue outrageous government misconduct."  (*Id.* at 82.)  The government asserts that this argument "rehashes the same claim that Aguiar made to the trial court and the Court of Appeals."  (Doc. 737 at 25.)  Williams, in addition to the statements noted above, explains as follows:

> [T]he court indicated during the hearing that evidence from the clerk's office would not be helpful because, in part, the government had presented evidence, in the form of emails, which showed that it had obtained DOJ authorization prior to presenting the wiretap application to the court. . . .  I believe that calling witnesses from the clerk's office would have been futile.

(Doc. 737-1 at 2.)

I agree that the issue regarding the July 2 warrant was adequately and appropriately litigated before both the trial and appellate courts, through the effective advocacy of Attorney Williams.  As is clear from the transcript of the August 4, 2010 suppression hearing, Williams diligently pursued the missing-authorization-page issue and argued that the government's evidence was not sufficient to prove that the full memorandum had been submitted to the Court.  (Doc. 624 at 76–86.)  Aguiar did not prevail on this point, and the Second Circuit affirmed the District Court ruling.  Even

---

[22]  This argument duplicates the argument discussed above, and thus is not reanalyzed here.

though Williams did not challenge the July 2 wiretap evidence in the precise manner espoused by Aguiar, he presented other arguments for the suppression of that evidence which demonstrated his "active and capable advocacy." *Harrington*, 562 U.S. at 111.

Furthermore, as stated in his affidavit, Williams made a strategic decision not to call any witnesses from the clerk's office, deferring to "the court's position" that further evidence from that office would not help. (*See* Doc. 737-1 at 2.) Indeed, the Court ultimately found that the July 2 warrant was valid: "The Government has provided the Court with electronic copies of documents verifying that [Deputy Assistant Attorney General] Keeney did in fact authorize the warrant application for the July 2 order." (Doc. 371 at 25.) Accordingly, Williams's strategy should not be second guessed, and he should not be faulted for failing to raise prosecutorial misconduct (*see* Doc. 723-1 at 82), or failing to investigate any purported difference between the application's "Filed" versus "Received" date stamps (*see id* at 81; Doc. 751 at 14–15). Williams's arguments regarding the missing page were objectively reasonable before trial and on appeal.

## H.    Failure to Seek Recusal of Judge Sessions

Aguiar contends that Attorney Williams was ineffective for not seeking Judge Sessions's recusal. (Doc. 723-1 at 84.) Specifically, Aguiar argues that Judge Sessions should have been recused from the suppression hearing because he "was a potential witness to the missing DOJ authorization page at the time he issued the July 2, 2009 wiretap warrant where an evident conflict of interest existed that clearly affected the judge's ability to be impartial." (*Id.*) Aguiar also states that Judge Sessions had

knowledge about the warrant application (*id.* at 85–86), and "had 'a personal bias or prejudice' against ruling in favor of defendants in the trial court" (*id.* at 87).

The government argues that "there is nothing in this case to support the claim that Judge Sessions was not impartial, or . . . had a personal bias or prejudice," and even if Judge Sessions had recused himself, another judge would have ruled the same way on the suppression motion.  (Doc. 737 at 28.)  Similarly, Williams states that he reviewed "the facts and the case law" and did not file a motion for recusal because he "did not believe there was any legal basis" for recusal.  (Doc. 737-1 at 2.)

Aguiar's argument appears to be founded on Aguiar's beliefs that (1) Judge Sessions was a potential witness on the issue of the missing DOJ authorization page (*see* Doc. 723-1 at 84), and (2) Judge Sessions had a "conflict of interest," bias, and/or knowledge requiring him to recuse himself from ruling on the suppression motion (*id.* at 86–87).  As discussed below, I find no merit to these assertions.

### 1.    Impartiality and Knowledge

Section 144 of Title 28, "requires recusal if a judge harbors a 'personal bias or prejudice' against a party."  *Lyman v. City of Albany*, 597 F. Supp. 2d 301, 307 (N.D.N.Y. 2009) (quoting 28 U.S.C. § 144).  "Similarly, § 455(b)(1) provides for recusal when a judge 'has a personal bias or prejudice concerning a party.'"  *Id.* (quoting 28 U.S.C. § 455(b)(1)).  And, "recusal is mandated under § 455(a) when a judge's 'impartiality might reasonably be questioned.'"  *Id.* (quoting 28 U.S.C. § 455(a)).  The Second Circuit has elaborated on the standard under 455(a): "Would a reasonable person, knowing all the facts, conclude that the trial judge's impartiality could reasonably be

questioned?  Or phrased differently, would an objective, disinterested observer fully

informed of the underlying facts, entertain significant doubt that justice would be done

absent recusal?"  *United States v. Bayless*, 201 F.3d 116, 126 (2d Cir. 2000) (quoting

*Diamondstone v. Macaluso*, 148 F.3d 113, 120–21 (2d Cir. 1998)).  "The Second Circuit

has instructed that sections 455 and 144 are to be read together, and that both are

generally governed by the same standards."  *United States v. Trudeau*, No. 10-CR-234

(JCH), 2016 WL 591754, at *3 (D. Conn. Feb. 11, 2016) (citing *Apple v. Jewish Hosp. &*

*Med. Ctr.*, 829 F.2d 326, 333 (2d Cir. 1987)), *appeal filed*, 2016 WL 591754 (2d Cir.

Mar. 2, 2016).  A party seeking recusal must file a motion that is supported by an

affidavit, and the affidavit must present "'the facts and the reasons for the belief that bias

or prejudice exists.'"  *Trudeau*, 2016 WL 591754, at *3 (quoting 28 U.S.C. § 144).

　　　In this case, there were no grounds for Judge Sessions's recusal based on

impartiality or personal knowledge.  Therefore, Williams's performance was not

deficient.  The recusal standards are clear: "To be disqualifying under § 455, "'[t]he

alleged bias and prejudice . . . must stem from an extrajudicial source and result in an

opinion on the merits on some basis other than what the judge has learned from his

participation in the case."'"  *S.E.C. v. Razmilovic*, 738 F.3d 14, 29 (2d Cir. 2013)

(emphasis omitted) (quoting *In re Int'l Bus. Machines Corp.*, 618 F.2d 923, 927 (2d Cir.

1980)).  Bias or impartiality may be shown, however, if the judge "display[s] a deep-

seated favoritism or antagonism that would make fair judgment impossible."  *Id.* (quoting

*Liteky v. United States*, 510 U.S. 540, 555 (1994).  The Second Circuit has also made it

clear that "[k]nowledge gained from the judge's discharge of his judicial function is not a

ground for disqualification under 28 U.S.C. § 455(b)(1)." *Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 447–48 (2d Cir. 2005) (citing *Katsaros v. Cody*, 744 F.2d 270, 283 (2d Cir. 1984)). And, "[a] district judge's prior decisions adverse to a defendant do not merit recusal." *Petrucelli v. United States*, Nos. 14 Civ. 9310, 02 CR 99, 2015 WL 5439356, at *5 (S.D.N.Y. Sept. 15, 2015).

Aguiar contends that a judge's knowledge of prior proceedings and adverse rulings against a defendant, in and of themselves, demonstrate bias. Aguiar is particularly troubled that the Court had "knowledge of [a] disputed evidentiary fact[]" under § 455(b)(1). (Doc. 723-1 at 85.) *See also* 28 U.S.C. § 455(b)(1). However, this argument conflicts with the established recusal principles cited above, as well as with the holding in *United States v. Carlton*, 534 F.3d 97, 101 (2d Cir. 2008), a case relied on by Aguiar, that a judge's knowledge from a prior revocation hearing does not warrant recusal in a later criminal trial because "[k]nowledge acquired by the judge while he performs judicial duties does not constitute grounds for disqualification," *id.* (quoting *United States v. Coven*, 662 F.2d 162, 168 (2d Cir. 1981))). Judge Sessions's knowledge gained from his review of the July 2 wiretap application does not qualify as knowledge of a disputed fact under § 455(b)(1), and thus did not merit his recusal.

Aguiar also claims that Williams's failure to file a recusal motion resulted in prejudice because Judge Sessions would have recused himself "as a matter of law" under §§ 144 and 455 had a motion been filed. (Doc. 723-1 at 87.) When a party moves for a judge's recusal, filing an "'affidavit of prejudice,'" *Trudeau*, 2016 WL 591754, at *4 (quoting *Nat'l Auto Brokers Corp. v. Gen. Motors Corp.*, 572 F.2d 953, 958 (2d Cir.

1978)), the judge "'has an affirmative duty to inquire into the legal sufficiency of such an affidavit and not to disqualify himself unnecessarily,'" *id.* (quoting *Nat'l Auto Brokers Corp.*, 572 F.2d at 958). Here, Judge Sessions would have had to disqualify himself "as a matter of law" only if the relevant affidavit was legally sufficient. (*See* Doc. 723-1 at 87.) Aguiar presents no evidence, however, to support this claim. *See Pham v. United States*, 317 F.3d 178, 182 (2d Cir. 2003).

### 2.      Potential to Serve as a Witness

Aguiar also asserts that Williams should have moved to recuse Judge Sessions because he was a potential witness at a suppression hearing. (Doc. 723-1 at 84.) Aguiar asserts that, if the Judge had been recused, Aguiar would have been afforded an "evidentiary hearing" and "the July 2, 2009 wiretap evidence would have been suppressed." (*Id.* at 87, 88 ("Had the judge [recused himself], [Aguiar] would have had his requested evidentiary hearing . . . .").)

Not only does Aguiar fail to prove this claim, he also inverts the legal analysis. When a party requests an evidentiary hearing and the presiding judge may be a witness, the judge must first determine whether the hearing is warranted: "[T]he determination of the need for a hearing and the request for recusal go hand in hand: If a hearing is necessary and the Court is a material witness, recusal follows; if no hearing is required, recusal as a witness is not at issue." *United States v. Rivera*, 634 F. Supp. 204, 210 (S.D.N.Y. 1986). Therefore, even if the judge had been a potential witness, Aguiar could have sought a determination from him as to whether an evidentiary hearing should be held. There would be no need for recusal prior to that determination. *See King v. United*

*States*, 576 F.2d 432, 437 (2d Cir. 1978) ("[A]ssuming Judge MacMahon would be a witness this would not disqualify him prior to the hearing, specifically from determining whether a hearing should be held." (citing *Panico v. United States*, 412 F.2d 1151, 1155–56 (2d Cir. 1969))).  Subsequently, if an evidentiary hearing was deemed necessary, the judge would have recused himself.  *See Rivera*, 634 F. Supp. at 210 ("[T]he Court need not consider recusal *before* determining whether a hearing is required.  The merely conclusory assertion that a hearing is required does not mandate recusal.")

However, the record indicates that the Court would have found an evidentiary hearing unnecessary.  At the first suppression hearing, Williams pressed for more evidence on the issue of the missing authorization page.  (Doc. 624 at 76–86.)  The Court took the issue "under advisement" (*id.* at 82), and later concluded that the government had received approval from a DOJ official for the July 2 wiretap warrant (Doc. 371 at 25).  The Second Circuit affirmed this ruling, finding "no error in the district court's refusal to conduct a hearing."  *Aguiar*, 737 F.3d at 264.  Therefore, the Court need not address Aguiar's assertions regarding a deputy court clerk's potential testimony (Doc. 723-1 at 88), or possible outcomes of any such hearing.  Absent a reasonable probability that Judge Sessions would have granted Aguiar a hearing on the missing page, Williams's failure to seek the Judge's recusal was not deficient.

## I.     Failure to Provide Aguiar Access to His Legal Documents

Aguiar claims that Williams provided ineffective assistance by "withholding [Aguiar's] access to his legal documents and denying his repeated requests to rev[ie]w his discovery evidence that included <u>Jencks</u> and <u>Giglio</u> material."  (Doc. 723-1 at 88.)  He

asserts that Williams "incapacitated [his] right to due process, his ability to participate in his own defense, and crippled [his] capacity to make informed decisions crucial to the adversarial process."  (*Id.*)  Aguiar further asserts that Williams's "deficient performance resulted in the filing of the § 851 information and undermined [his] ability to mount a defense or make constitutionally protected informed decisions" such as whether to plead guilty, testify, or proceed *pro se*.  (*Id.*)[23]

The government responds that, by the time Aguiar was presented with a plea offer, he had access to all the evidence available up to that point (Doc. 737 at 29), and Williams made a reasonable decision to withhold *Jencks*/*Giglio* material because, in Williams's opinion, Aguiar was "sabotaging his defense" (*id.* at 30).  The government also contends that "[t]he evidence against Aguiar was overwhelming and it is not likely that an earlier review" of the withheld discovery materials would have changed the verdict.  (*Id.* at 31.)

In his affidavit, Williams refers to his decision to withhold discovery as an "extraordinary action."  (Doc. 737-1 at 4.)  Nonetheless, at the time, he concluded it was an appropriate action as he had learned that Aguiar was discussing "privileged conversations" with his (Aguiar's) sister during recorded jail calls.  (*Id.* at 3.)  Furthermore, Williams states that he made this decision in February 2011, after Aguiar had decided to reject the government's proposed plea offer.  (*Id.* at 3, 4.)  Until that time, Williams had been diligent in providing Aguiar with discovery materials: he provided

---

[23] Aguiar adds that he was also prejudiced because his letters to the Court "were being forwarded to his attorney."  (Doc. 723-1 at 91.)  This assertion does not relate to actions Williams took in his representation of Aguiar, and thus I do not consider it.

copies of "thousands of pages of documents, wiretapped recordings of thousands of telephone calls and related line sheets, hundreds of hours of recorded prison calls made by Mr. Aguiar and his co[]defendants, and banking and telephone records," along "with an iPod loaded with the wiretapped recordings so [Aguiar] could listen to the calls." (*Id.* at 2.) When the discovery documents were destroyed at the Essex County Jail, Williams provided Aguiar with a second copy of them all. (*Id.* at 3.)

Williams also states that, despite his many warnings to Aguiar "not to discuss the case with anyone" except Williams and his staff (*id.* at 4), Williams was aware that Aguiar not only discussed the case with his sister but also sent letters to codefendants (*id.* at 3). "Some of these letters contained veiled (and some not so veiled) threats should [Aguiar] be convicted." (*Id.*) Williams perceived that "Mr. Aguiar had no intention to stop communicating otherwise privileged communications, including trial strategy, to others." (*Id.* at 4.) He therefore sent a letter to Aguiar explaining his decision to withhold "additional discovery," including the *Jencks*/*Giglio* material. (*Id.*)

While Williams's decision to withhold discovery may have been "extraordinary," it was not unreasonable, given that Aguiar was unable or unwilling to refrain from sharing trial strategy and privileged information with others on recorded prison telephone lines. *See United States v. Zackson*, 6 F.3d 911, 919 (2d Cir. 1993) ("This Court . . . must consider all relevant circumstances in determining whether counsel's representation was objectively reasonable." (citing *Strickland*, 466 U.S. at 688)). Moreover, "[d]efense counsel is not required to present a defendant, for his review, with all discovery material that defense counsel acquires." *Rodriguez v. United States*, Nos. 11 Civ. 6707(NRB), 09

65

CR 58(NRB), 2013 WL 3388223, at *6 (S.D.N.Y. July 8, 2013) (citing *United States v. Im*, No. 07 Cr. 737(PKC), 2009 WL 2191231, at *10–11 (S.D.N.Y. July 17, 2009), *aff'd sub nom.*, *United States v. Sangmin Chun*, 399 Fed. App'x 669 (2d Cir. 2010)). Williams's decision was based on sound strategy to protect Aguiar. Some deference is owed to Williams's professional judgment, and I conclude that his performance was satisfactory. *See Murden v. Artuz*, 497 F.3d 178, 198 (2d Cir. 2007) ("Counsel is 'strongly presumed' to have exercised reasonable judgment in all significant decisions." (quoting *Strickland*, 466 U.S. at 690)).

As for prejudice, Aguiar argues that "[c]ounsel's deficient performance resulted in the filing of a § 851 information and undermined [Aguiar's] ability to mount a defense or make constitutionally protected informed decisions to: plead guilty, go to trial, . . . testify in his own defense, allocute at sentencing, or raise issues on direct appeal in a pro se capacity." (Doc. 723-1 at 88.) He also claims that, had he had access to the materials, he would have sought to represent himself before the trial court (*id.* at 88, 91); and had he been able to review all discovery materials including the "MySpace discovery evidence," the outcome would have been different (*id.* at 90–91).

Again, Aguiar fails to satisfy his burden of proof, i.e., he fails to show that access to the *Jencks*/*Giglio* materials would have changed his decision to not enter a plea of guilty, testify, proceed to trial, represent himself *pro se*, or exercise other significant rights. First, Aguiar rejected the government's plea offer before February 22, 2011, the date on which Williams received the *Jencks*/*Giglio* materials. (Doc. 737-1 at 3–4; *see also* Doc. 737-3 at 1–3 (January 27, 2011 letter from Williams to Aguiar regarding plea

66

offer).)  As a result, Williams's withholding of the *Jencks*/*Giglio* materials could not have caused the filing of the § 851 Information because the Information was filed on February 11, 2011.  (*See* Doc. 396.)  Second, Aguiar's conclusory statement that the *Jencks*/*Giglio* materials would have affected his decision to testify is insufficient.  *See United States v. Noorzai*, 953 F. Supp. 2d 499, 507 (S.D.N.Y. 2013) (attorney allegedly ignored client's request to testify, and stated, "Noorzai's self-serving, conclusory statement that Fisher 'either ignored [his] requests, or specifically stated that [he] was not permitted to testify,' is insufficient to substantiate his claim" (alterations in original) (citation omitted)).  Third, it is not clear that the Court would have permitted Aguiar to represent himself at trial.  *See Williams v. Bartlett*, 44 F.3d 95, 99–102 (2d Cir. 1994) (explaining procedure to request *pro se* status and describing court's subsequent inquiry).  Fourth, there is no indication that Aguiar would have been permitted to proceed *pro se* on appeal.  Whereas the Sixth Amendment affords individuals the right to self-representation at trial (as long as certain prerequisites are met), "the Amendment itself does not provide any basis for finding a right to self-representation on appeal."  *Martinez v. Court of Appeal of Cal., Fourth Appellate Dist.*, 528 U.S. 152, 160 (2000).[24]

Lastly, Aguiar does not demonstrate that access to the MySpace documents would have changed the outcome of the case.  *See Rodriguez*, 2013 WL 3388223, at *6 (stating that the defendant in that case did "not specif[y] . . . how these documents would have

---

[24] The conclusory assertions in Aguiar's Declaration and other filings, including statements that he did not receive the relevant discovery, do not affect this analysis.  (*See* Doc. 751-1 at 3.)  As discussed above, even if Aguiar was not provided *all* discovery evidence, that does not mean Williams's representation of him was ineffective.  *See Rodriguez*, 2013 WL 3388223, at *6.

altered his defense, proven his innocence, or otherwise changed the outcome of the trial"). The MySpace evidence was a tiny fraction of the overwhelming amount of evidence the government presented at trial. Given the government's "very strong case" against Aguiar, *Im*, 2009 WL 2191231, at *11, Williams's alleged withholding of the MySpace documents did not prejudice Aguiar, *see id.* (assuming deficient performance due to withheld discovery documents, court found no prejudice in part because "[t]he government put on a very strong case").

In sum, Williams's decision to withhold *Jencks/Giglio* materials before trial does not constitute ineffective assistance, nor did it result in any prejudice. Williams's appellate representation also was not ineffective in this respect. Nor was Williams's purported withholding of MySpace records and other evidence ineffective. Accordingly, Aguiar's ineffective-assistance claim based on withheld discovery evidence fails.

## J. Failure to Raise on Appeal Prosecutorial Misconduct Regarding Withheld GPS-Related Discovery

Lastly, Aguiar makes a series of assertions regarding Attorney Williams's failure to raise the issue of prosecutorial misconduct on appeal. (Doc. 723-1 at 92–100.)[25] He contends that the prosecution misled the defense before trial and did not comply with its discovery obligation with respect to GPS data. (*Id.* at 94–97.) More specifically, he asserts that the government did not disclose that the GPS devices were installed on

---

[25] In "Ground Ten" of Aguiar's Motion, the first section heading refers to *appellate* counsel's failures. (Doc. 723-1 at 92.) Also, Aguiar's subsequent argument focuses primarily on the deficiencies of appellate counsel. Toward the end of the same argument, however, Aguiar refers to Williams's failure to object to government deception *at trial*. (*See, e.g.*, *id.* at 100 ("Hence, the issues outlined above were not objected to by trial counsel, nor raised on appeal by appellate counsel.").) Because "Ground Ten" primarily revolves around Williams's appellate representation, I construe Aguiar's argument here to assert only the ineffectiveness of Williams on appeal.

Aguiar's car within the protected curtilage of the home, and that the government provided the defense with "redacted copies of select latitude and longitude coordinates." (*Id.* at 97.) Aguiar also contends that the government did not provide the defense with exculpatory "ping reports" or GPS software. (*Id.* at 92–98.) Aguiar argues that as a result, the defense was unable to seek suppression of the GPS data on the basis that it was unlawfully collected in the protected "curtilage" of the home. (*Id.* at 93–98.) Finally, he claims that the government's misconduct violated his rights to due process and a fair trial (*id.* at 98; Doc. 751 at 19), and Williams's failure to raise this issue on appeal prejudiced his case (Doc. 723-1 at 98–100).

The government responds by stating that it did provide Aguiar with the GPS data prior to trial, which included the latitude and longitude coordinates generated by the GPS devices. (Doc. 737 at 31 n.19.) Possession of the software, the government adds, would not have changed the outcome. (*Id.* at 31–32 n.19.) The government also asserts that the defense sought "reports" that did not, and still do not, exist: "[t]he sole evidence about where [Aguiar's] vehicles were parked when the [GPS] devices were placed came in the form of testimony from DEA Special Agent Rick Carter during the trial." (*Id.* at 31.) Lastly, the government states that the GPS devices were not placed on the cars within the protected curtilage of the home, and a suppression motion therefore would not have changed the outcome. (*Id.* at 32.)

Attorney Williams further counters Aguiar's assertions by stating that he "raised the issue about the placement of the GPS devices during the first hearing on the motion to suppress on August 4, 2010." (Doc. 737-1 at 4.) He adds:

> [T]he trial evidence later established that the devices had been placed while Mr. Aguiar's car was parked in the parking lot of his father's residence or while Mr. Aguiar's car was parked on the street near his home in Quincy, Massachusetts.  Neither location is within the constitutionally protected curtilage of the home . . . .

(*Id.*)  Williams concludes that "there was no basis to file a motion to suppress."  (*Id.*)

Although Williams and the government oversimplify and perhaps misconstrue Aguiar's assertions, and neglect to respond to all of Aguiar's arguments, the record shows that Williams was not ineffective on appeal by failing to raise the GPS-related issues set forth above.

"To establish that appellate counsel failed to render effective assistance, a petitioner must do more than simply demonstrate that counsel omitted a non[]frivolous argument, because appellate counsel is not required to raise all potentially colorable arguments."  *Carroll v. David*, No. 9:04-CV-0307, 2009 WL 666395, at *10 (N.D.N.Y. Mar. 11, 2009) (citing *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994)).  "[T]he choice of which issues to raise on appeal is a matter of professional judgment left to appellate counsel."  *Parks v. Sheahan*, 104 F. Supp. 3d 271, 288 (E.D.N.Y. 2015) (citing *Jones v. Barnes*, 463 U.S. 745, 751 (1983)).  Still, "a petitioner may establish constitutionally inadequate performance [of appellate counsel] if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker."  *Lynch v. Dolce*, 789 F.3d 303, 311 (2d Cir. 2015) (alteration in original) (quoting *Mayo*, 13 F.3d at 533).

Both before the trial court and on appeal, Williams extensively litigated admission of the GPS evidence.  Aguiar demonstrates only that on appeal Williams failed to argue

prosecutorial misconduct surrounding GPS evidence; he does not show that "the omitted issue is clearly stronger and more significant than those presented." *Carroll*, 2009 WL 666395, at *10. Therefore, Aguiar's final claim of ineffective assistance of appellate counsel does not succeed.[26]

## III.   Claim Under *Brady v. Maryland*

In Aguiar's supplemental motion (Doc. 756), he presents a new claim under *Brady v. Maryland*, 373 U.S. 83 (1963). Specifically, he asserts that the government failed to disclose the following favorable evidence to the defense: (1) GPS devices were repeatedly installed on Aguiar's vehicles while those vehicles were on private property, (2) federal investigators used a contractor's GPS tracking program to monitor Aguiar, and (3) the GPS tracking devices were "intentionally suppressed." (Doc. 756 at 4–8.) The government argues that Aguiar's *Brady* claim is "baseless." (Doc. 763 at 2.)

Aguiar did not raise his *Brady* claim on appeal to the Second Circuit, and it is well established that "a motion under § 2255 is not a substitute for direct appeal." *Sapia v. United States*, 433 F.3d 212, 217 (2d Cir. 2005). Thus, Aguiar has procedurally defaulted the claim "unless he can show '(1) cause for failing to raise the issue, and prejudice resulting therefrom; or (2) actual innocence.'" *Id.* (quoting *Rosario v. United States*, 164 F.3d 729, 732 (2d Cir. 1998)); *see also Bousley v. United States*, 523 U.S. 614, 622 (1998).

---

[26] "In order '[for] a federal habeas Court to find a due process violation' based on prosecutorial misconduct 'Petitioner must show that, in the context of the entire trial, that conduct had such a prejudicial effect that Petitioner was denied a fundamentally fair trial.'" *Scott v. United States*, Nos. 11 CV 4638(HB), 08 CR 360(HB), 2012 WL 2094052, at *2 (S.D.N.Y. June 11, 2012) (quoting *Mucci v. Quinlan*, No. 83 Civ. 7263 (LLS), 1986 WL 6776, at *6 (S.D.N.Y. June 10, 1986)). Because Williams did not perform deficiently, I need not address Aguiar's due process or denial-of-a-fair-trial arguments.

Aguiar does not claim actual innocence or present any evidence in support of such a claim. The question, therefore, is whether he has successfully shown "cause" for the procedural default, with prejudice resulting. "Cause" is demonstrated by some "objective impediment" such as "'a showing that the factual or legal basis for a claim was not reasonably available to counsel'" during trial. *Gutierrez v. Smith*, 702 F.3d 103, 111 (2d Cir. 2012) (quoting *Strickler v. Greene*, 527 U.S. 263, 283 n.24 (1999)). Aguiar's supplemental motion does not refer explicitly to procedural default principles, but he does state that his *Brady* claim is "based on newly discovered evidence." (Doc. 756 at 1.) That evidence appears to consist of recent admissions by the DEA that an "independent government contractor" assists with GPS tracking and that GPS data is saved to the "contractor's server." (*Id.* at 4.) Construing Aguiar's submission "to raise the strongest arguments [it] suggest[s]," *Wright v. Comm'r of Internal Revenue*, 381 F.3d 41, 44 (2d Cir. 2004), I find Aguiar has asserted "cause" based on these purported admissions, as they are factual bases that were previously unavailable. (*See* Docs. 756-1, 756-2.) However, Aguiar has not shown cause for failing to appeal the issue regarding the locations at which the GPS devices were installed; in fact, he states that he became aware of the issue at trial. (Doc. 756 at 3.) And although ineffective assistance of counsel may constitute the "cause" for the procedural default, *see Coleman v. Thompson*, 501 U.S. 722, 754 (1991), Aguiar's claim of ineffective assistance based on an almost-identical GPS-related issue was rejected above. *See supra* pp. 68–71.

Accordingly, I address only the "newly discovered evidence" concerning purported DEA admissions, but conclude that Aguiar has not demonstrated the requisite

prejudice to excuse his procedural default.  "The challenged defects are sufficiently

prejudicial only if 'they worked to [the petitioner's] *actual* and substantial disadvantage,

infecting [the] entire [proceedings] with error of constitutional dimensions.'"  *Yalincak v.*

*United States*, 575 F. Supp. 2d 385, 387 (D. Conn. 2008) (alterations in original) (quoting

*United States v. Frady*, 456 U.S. 152, 170 (1982)).  Aguiar merely states that he "would

not have been convicted at his 2011 criminal trial" without the GPS evidence (Doc. 756

at 5), and the defense would have been able to impeach Agent Carter if the government

had not suppressed the GPS-related evidence (*id.* at 7).  However, the allegedly defective

GPS evidence did not substantially disadvantage Aguiar.  That evidence was one

component of the government's very strong case against Aguiar.  As noted above, the

witness testimony and wiretap evidence were particularly devastating to Aguiar, and the

evidence of Aguiar's guilt was overwhelming notwithstanding the GPS data.  *See*

*Monegro v. Greiner*, No. 03 Civ. 2735(NRB), 2004 WL 187129, at *3 (S.D.N.Y. Jan. 28,

2004) (considering "the overwhelming evidence of petitioner's guilt" in prejudice

analysis).

     Nevertheless, even if Aguiar were able to satisfy his burden of showing prejudice,

*see id.*, he has not demonstrated a *Brady* violation.  "In *Brady*, this Court held 'that the

suppression by the prosecution of evidence favorable to an accused upon request violates

due process where the evidence is material either to guilt or to punishment, irrespective

of the good faith or bad faith of the prosecution.'"  *Strickler*, 527 U.S. at 280 (quoting

*Brady*, 373 U.S. at 87).  *Brady* applies to exculpatory and impeachment evidence, *id.*

(citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)), but the evidence is only

considered material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," *id.* (quoting *Bagley*, 473 U.S. at 682).

Here, there is no reasonable probability that Aguiar's "newly discovered evidence" about the contractor's involvement with the GPS tracking would have affected the outcome of the proceeding.  Assuming the exhibits referenced in Aguiar's "Attachment 1" (Doc. 756-1 at 3) are the same as the GPS-related exhibits Aguiar takes issue with in his supplemental motion (Doc. 756 at 7), Attachment 1 indicates that the DEA "helped prepare" the relevant exhibits, but that it is also "unknown how the exhibits were created" (Doc. 756-1 at 3).  These somewhat conflicting statements do not support Aguiar's contention that Agent Carter "was in no position to testify about" the GPS data. (Doc. 756 at 7.)  To the contrary, the trial record indicates that Agent Carter testified based on his personal knowledge, and, in fact, that he was the DEA agent responsible for "handling and managing [the GPS] equipment."  (Doc. 614 at 109; *see also* Doc. 614 at 108–19, 145–50.)  *See* Fed. R. Evid. 602.  Furthermore, "Attachment 2" states that the "DEA does contract for a service that allows for viewing the location of a GPS tracking device[] . . . [and] the data received from the GPS device is saved in the system for a limited amount of time."  (Doc. 756-2 at 10.)  But beyond affirming the *existence* of the contractor's service, I cannot discern whether such a service was used in Aguiar's case. Also, Attachment 2 does not support Aguiar's assertions that the defense could have impeached Agent Carter's testimony with this evidence of the contractor software and server, and that Carter improperly testified about the GPS data collected in this case.

(*See* Doc. 756 at 7 (claiming "custodian of the contractor" should have testified about the exhibits).)

Lastly, the Court need not accept Aguiar's conclusory allegations that the government suppressed the GPS devices.  (*See* Doc. 756 at 8.)  "Conclusory or speculative allegations that the Government failed to disclose evidence are insufficient to support a *Brady* violation."  *Chrysler v. Guiney*, 14 F. Supp. 3d 418, 450 (S.D.N.Y. 2014), *aff'd*, 806 F.3d 104 (2d Cir. 2015) (internal quotation marks omitted).  In addition, Aguiar was aware of the use of GPS tracking well before his trial, *see supra* p. 9 (describing March 2010 motion to suppress), and "[e]vidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence."  *Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001) (quoting *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982)).  For all these reasons, Aguiar's *Brady* claim fails.

## IV.    Resentencing if Aguiar's Prior Drug Convictions Are Vacated

Aguiar has requested that the Court resentence him "[i]n the event that this Court vacates [his] 1995 or 2001 prior drug conviction."  (Doc. 723-1 at 100.)  He asks that the Court "hold this claim in abeyance until these collateral actions are final."  (*Id.*)  Because Aguiar's claims are without merit, there is no need to address this request here.

## V.    Motions to Conduct Discovery and Expand/Supplement Record

Aguiar has also filed a Motion for Leave to Conduct Discovery (Doc. 719), a Motion to Expand the Record (Doc. 720), and a Motion to Supplement the Record (Doc. 728).  I recommend denying these motions for the following reasons.

Under Rule 6(a) of the Rules Governing Section 2255 Proceedings for the United States District Courts, "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law."  Under Rule 7(a), "[i]f the motion is not dismissed, the judge may direct the parties to expand the record by submitting additional materials relating to the motion."  Rule 8(a) provides that, "[i]f the motion is not dismissed, the judge must review the answer, any transcripts and records of prior proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted."

Here, the record is sufficient, without further discovery, for the Court to rule on Aguiar's § 2255 Motion.  Therefore, no Rule 6 discovery is warranted, and I recommend that the Court DENY Aguiar's Motion for Leave to Conduct Discovery (Doc. 719).  In addition, because I recommend dismissal of Aguiar's § 2255 Motion, the parties need not expand the record under Rule 7 or supplement the record.  Therefore, I recommend that the Court DENY Aguiar's motions to expand and supplement the record (Docs. 720, 728).

## VI.    Evidentiary Hearing

When ruling on a § 2255 motion, the district court is required to hold a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255; *see Pham*, 317 F.3d at 185 (stating section 2255 does not permit summary dismissals of motions that present facially valid claims).  However, § 2255 does not entitle the defendant to a hearing where his

allegations are "vague, conclusory, or palpably incredible." *Machibroda v. United States*, 368 U.S. 487, 495 (1962); *see Chang v. United States*, 250 F.3d 79, 85 (2d Cir. 2001). To warrant a hearing, the defendant's motion must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle him to relief. *See Machibroda*, 368 U.S. at 494; *United States v. Aiello*, 814 F.2d 109, 113–14 (2d Cir. 1987).

Aguiar's § 2255 Motion does not raise specific facts supported by competent evidence that would entitle him to relief if proved at an evidentiary hearing. Accordingly, no hearing is required.

## VII.   Motion to Strike

Aguiar moves to strike Attorney Williams's affidavit and other government exhibits.  (Doc. 746 at 1.)  He also moves to exclude "any references to said affidavit and/or exhibits in the government's opposition to his claims of ineffective assistance of counsel."  (*Id.* at 2.)  He asserts that Williams "did not certify his alleged claims under penalty of perjury consistent with [28 U.S.C. § 1746] or Second Circuit authority."  (*Id.* at 1.)

Second Circuit precedent indicates that, absent unusual circumstances, defense attorneys should be given the opportunity to respond to claims of their ineffectiveness. *Bloomer v. United States*, 162 F.3d 187, 194 (2d Cir. 1998) ("'[E]xcept in highly unusual circumstances,' the assertedly ineffective attorney should be afforded 'an opportunity to be heard and to present evidence, in the form of live testimony, affidavits, or briefs.'" (quoting *Sparman v. Edwards*, 154 F.3d 51, 52 (2d Cir. 1998))).  Here, Attorney

Williams's responses to Aguiar's claims of ineffectiveness were properly provided in an exhibit attached to the government's Opposition to Aguiar's § 2255 Motion.  (*See* Doc. 737-1.)  I thus recommend that the Court DENY Aguiar's Motion to Strike (Doc. 746).

## VIII.   Motion for Order Directing Government or Counsel to Provide Defendant with Discovery Material

Aguiar moves for an order directing the government or Williams to provide him with "a paper copy of his complete discovery file" (Doc. 714 at 1), as well as "paper copies of the government's admitted trial exhibits" (*id.* at 4).  As stated above, however, "[d]efense counsel is not required to present a defendant, for his review, with all discovery material that defense counsel acquires."  *Rodriguez*, 2013 WL 3388223, at *6.  Moreover, Aguiar's § 2255 Motion is without merit for the reasons stated above.  Therefore, I recommend that the Court DENY this Motion (Doc. 714).

## IX.     Motion and Renewed Motion for Appointment of Counsel

Because I recommend that the Court deny Aguiar's § 2255 Motion, I also recommend that the Court DENY both Aguiar's initial Motion for Appointment of Counsel (Doc. 718) and his Renewed Motion for Appointment of Counsel (Doc. 735).

## Conclusion

For these reasons, I recommend that the Court DENY Aguiar's § 2255 Motion to Vacate (Doc. 717); and DENY Aguiar's Motion for Leave to Conduct Discovery (Doc. 719), Motion to Expand the Record (Doc. 720), Motion to Supplement the Record (Doc. 728), Motion to Strike (Doc. 746), Motion for Order Directing Government or Counsel to Provide Defendant with Discovery Material (Doc. 714), Motion for Appointment of

Counsel (Doc. 718), and Renewed Motion for Appointment of Counsel (Doc. 735).  If these recommendations are adopted, I also recommend that the Court DENY Aguiar's Motion to Strike Agent Carter's testimony (Doc. 757) as moot.

      Dated at Burlington, in the District of Vermont, this 12th day of August, 2016.


                            /s/ John M. Conroy
                            John M. Conroy
                            United States Magistrate Judge


Any party may object to this Report and Recommendation within 14 days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c).  Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision."  *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).